UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NORTH PORT FIREFIGHTERS' PENSION – LOCAL OPTION PLAN, Individually and on behalf of all others similarly situated, | § § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:11-CV-3119-B |
| TEMPLE-INLAND, INC., KENNETH M. JASTROW II, KENNETH R. DUBUQUE, RONALD D. MURFF, and CRAIG E. GIFFORD, | § § § § § § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are the Motions to Dismiss filed June 20, 2012 by Defendants Temple-Inland, Inc. ("Temple-Inland"), Kenneth M. Jastrow II ("Jastrow"), Kenneth R. Dubuque ("Dubuque"), Ronald D. Murff ("Murff"), and Craig E. Gifford ("Gifford") (collectively, "Defendants") at documents 37, 42, 44, and 47. The Motions seek dismissal of Plaintiff's Amended Class Action Complaint[1] ("Amended Complaint") filed April 19, 2012. For the reasons stated below, Defendants' Motions are **GRANTED**. Plaintiffs' claims against Temple-Inland are **DISMISSED WITHOUT PREJUDICE** for failing to plead facts supporting their claims with particularity, for engaging in impermissible group and puzzle pleading, for failing to allege that Temple-Inland "made" any of the alleged misstatements in the Amended Complaint, failing to allege Temple-Inland's

[1]The Court's citations refer to the Amended Complaint as "FAC," as this is Plaintiffs' first amended complaint.

1

scienter, and for failure to allege loss causation. Plaintiffs' claims against Jastrow, Dubuque, Murff, and Gifford ("the Individual Defendants") are hereby **DISMISSED WITHOUT PREJUDICE** for failing to plead facts supporting their claims with particularity, for engaging in impermissible group and puzzle pleading in their allegations against the Individual Defendants, and for failure to adequately allege the Individual Defendants' scienter, loss causation, and control person liability.[2]

---

[2]Defendants' Motions to Dismiss are **DENIED** to the extent that they seek dismissal of all claims based on other arguments contained in their motions to dismiss and **GRANTED IN PART** and **DENIED IN PART** with respect to certain partial defenses, as detailed later in this opinion.

## TABLE OF CONTENTS

I.     BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.    LEGAL STANDARDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.   ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      A.    *Group and Puzzle Pleading as to all Defendants.* . . . . . . . . . . . . . . . . . . . . . . 13

      B.    *Did Temple-Inland or Jastrow "Make" the Statements at Issue?*. . . . . . . . . . . . . . 16
           1.    Temple-Inland. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
           2.    Jastrow. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      C.    *Were the Statements by Any of the Defendants False or Misleading?.* . . . . . . . . . . . 24
           1.    Alleged GAAP Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
           2.    Allegedly False Financial Figures. . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
           3.    Other Alleged Misstatements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      D.    *Scienter.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
           1.    Allegations Common to All Individual Defendants. . . . . . . . . . . . . . . 32
           2.    Jastrow. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
           3.    Dubuque.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
           4.    Murff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
           5.    Gifford. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
           6.    Temple-Inland. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

      E.    *Safe Harbor Defense.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

      F.    *Loss Causation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

      G.    *Statute of Limitations.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

      H.    *Control Person Liability.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

IV.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

# I.

# BACKGROUND

This action is a private securities fraud putative class action on behalf of all purchasers of Guaranty Financial Group, Inc. ("GFG") common stock between December 12, 2007 and August 24, 2009 (the "Class Period") against Temple-Inland and certain of Temple-Inland's and Guaranty's officers and directors (collectively "Defendants") for violations of the Securities and Exchange Act of 1934 (the "Exchange Act"). FAC ¶ 1. Guaranty Financial Group was a bank-holding company that owned all the stock of Guaranty Bank (the "Bank"). *Id.* at ¶ 8. For simplicity, the Court will refer to both GFG and the Bank as "Guaranty." [3] Temple-Inland is a holding company that operates several businesses through its various subsidiaries, including corrugated packaging, forest products, building products, and real estate and financial services businesses. Id. at ¶ 7.

During December of 2007, Guaranty was spun off from Temple-Inland and common shares of Guaranty were distributed to Temple-Inland shareholders (the "Spin-Off"). *Id.* at ¶ 8. Plaintiffs allege that prior to the Spin-Off, Temple-Inland dominated and controlled Guaranty and its subsidiaries such that each was the alter-ego of Temple-Inland, and that Temple-Inland used the Bank to support, create demand, and generate profits for its core building products business, rather than operating it as a traditional bank. *Id.* This alleged conduct led at least in part to Guaranty's eventual bankruptcy filing and a suit filed on August 22, 2011 by Kenneth L. Tepper, the Liquidation Trustee for GFGI Liquidation Trust and Assignee of the Federal Deposit Insurance Corporation ("FDIC"), *Tepper v. Temple-Inland, Inc.*, No. 3:11-cv-2088 (N.D. Tex.) (the "*Tepper*

---

[3] As addressed above, the Bank and GFG filed for bankruptcy protection and are not parties to this suit.

Complaint"). *See id.* at ¶¶ 8, 20.

The *Tepper* Complaint asserted numerous claims involving fraudulent and preferential transfers and breach of fiduciary duty against Temple-Inland, TIN, Inc., Forestar (USA) Real Estate Group Inc., Kenneth M. Jastrow II, Randall D. Levy, Arthur Temple III, and Larry E. Temple. These claims were eventually settled for $80 million, with $38 million paid to Mr. Tepper as Liquidation Trustee and $42 million to the FDIC, with no admission of liability by the defendants in that case.[4] *See* Order Approving Compromise and Settlement Agreement Ex. A, filed Nov. 19, 2012, *In re Guaranty Fin. Grp. Inc.*, Case 09-35582-bjh11 (Bankr. N.D. Tex.).

Shortly after the *Tepper* Complaint was filed, Plaintiffs filed the instant case against Defendants Temple-Inland, Jastrow, Dubuque, Murff, and Gifford alleging securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78(t)(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.[5] Plaintiffs base these

---

[4]The Court expresses no opinion as to any allegations of malfeasance not connected to the alleged securities fraud in this case.

[5]Section 10(b) states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,

allegations on their review of Temple-Inland and Guaranty SEC filings, other publicly available reports, filings, and articles, the *Tepper* Complaint, and interviews of former company employees. FAC ¶ 20. These interviews apparently include five confidential witnesses who are former senior-level employees for Guaranty, each of whom was employed by Guaranty during the Class Period. *Id.* at ¶¶ 22-27.

While the *Tepper* Complaint centered on claims of improper transfers and breach of fiduciary duty, the Amended Complaint in this case is based exclusively on Plaintiffs' allegations that the Defendants violated federal securities laws. More precisely, Plaintiffs allege that during the Class Period, Guaranty issued materially false and misleading financial statements which overstated the fair value of its mortgage-backed securities ("MBS") portfolio and understated unrealized losses of that portfolio. *Id.* at 48. As part of this alleged fraudulent scheme, Guaranty "engaged in improper financial practices that were designed to, and did, artificially inflate the Bank's regulatory capital, thereby masking the true financial condition of the Company," by understating the Bank's losses so

---

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Section 20(a) states:

Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

that its "minimum regulatory capital requirements would not be breached" and the Bank "would be

afforded the time necessary to procure much needed capital."[6] *Id.* at ¶ 41. Specifically, Plaintiffs

allege that:

> [D]uring the Class Period, Defendants, in violation of GAAP[7] and SEC rules and
> regulations, caused the Company to issue materially false and misleading financial
> statements by masking hundreds of millions of dollars in OTTI[8] losses on its MBS
> portfolio . . . . During the Class Period, Guaranty represented that the financial
> reports it issued were presented in conformity with GAAP. In violation of GAAP and
> SEC rules and regulations, Defendants:
>     (a) reported fair values and unrealized losses on the Company's MBS portfolio
> that the Defendants knew to be materially overstated and understated, respectively;
>     (b) failed to timely record an OTTI in the value of the Company's MBS
> portfolio; and
>     (c) failed to disclose material events about the diminution in the value of the
> MBS portfolio occurring subsequent to December 31, 2007 and prior to the filing of
> the 2007 Form 10-K.

FAC ¶¶ 47-48. Plaintiffs allege that this overstatement of fair values and understatement of losses

was a result of Guaranty's use of improper pricing models to value its MBS portfolio. *Id.* at ¶ 52.

Plaintiffs further allege that Defendants "repeatedly and falsely highlighted" the safety of Guaranty's

---

[6]Plaintiffs allege that "[a]s a savings and loan company, the Bank was subject to regulations established by the [Office of Thrift Supervision, or "OTS"] and the FDIC, including those associated with the maintenance of certain capital requirements." FAC ¶ 42. The term "capital requirements" refers to the amount of capital a lending institution is required to maintain. Federal statutes and regulations use ratios comparing the amount of capital to certain assets in order to measure the capital adequacy of a lending institution. *See* FAC ¶¶ 43-44.

[7]As alleged by the Amended Complaint, "GAAP" refers to Generally Accepted Accounting Principles and "consists of those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time." FAC ¶¶ 45, 49.

[8]"OTTI" is a GAAP term which refers to "other than temporary impairments" in the value of investments. As alleged by Plaintiffs, "unrealized losses on investment securities classified as 'available-for-sale' or 'held-to maturity' are not reported against net income, and accordingly, are not included in retained earnings and regulatory capital, until: (i) such losses become realized via a sale; or (ii) they are deemed to be impaired due to an 'other than temporary' decline in their value." FAC ¶¶ 45-46.

portfolio, though they have since withdrawn their repeated allegations that Defendants falsely represented that their MBS portfolio consisted solely of "senior tranche" securities. *See id.* at ¶ 53; Pls.' Resp. 73-74.

Despite these repeated assurances regarding the safety of its MBS portfolio, Guaranty's financial situation continued to deteriorate throughout the Class Period. This deterioration eventually resulted in Guaranty falling below required capital ratios prescribed by the Office of Thrift Supervision ("OTS") and culminated in a $1.45 billion write down of the value of Guaranty's MBS portfolio on July 17, 2009. Unable to procure the necessary capital, Guaranty was eventually closed by the OTS and the FDIC was appointed as a receiver, with the company filing for bankruptcy protection under Chapter 11 shortly thereafter.[9] FAC ¶¶ 186-190.

In response to the filing of the Amended Complaint, Defendants Temple-Inland, Jastrow, Dubuque, and Gifford together with Murff filed four separate motions to dismiss. In their motions, Defendants argue, *inter alia*, that Temple-Inland and Jastrow did not make any of the alleged misstatements, that the Amended Complaint fails to allege fraud with particularity and relies on impermissible group and puzzle pleading, that certain of the alleged statements are protected by the Private Securities Litigation Reform Act's safe harbor, that the Amended Complaint fails to properly plead loss causation or control person liability, and that Plaintiffs' claims are barred by the statute of limitations. Plaintiffs responded to the motions and Defendants filed their replies to Plaintiffs' response. The motions are now ripe for disposition.

---

[9]Guaranty is not named as a defendant in this case, presumably because Guaranty's filing for bankruptcy protection would result in either the operation of the Bankruptcy Code's automatic stay of all claims against Guaranty, or because Guaranty is likely judgment-proof.

## II.

## LEGAL STANDARDS

In analyzing a complaint under Federal Rule of Civil Procedure 12(b)(6), the Court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004). The complaint should be dismissed only if it does not include enough facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim must be "nudged . . . across the line from conceivable to plausible." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *SW Bell Tel., LP v. City of Hous.*, 529 F.3d 257, 260 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555).

Special pleading rules apply to fraud claims. Pursuant to Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"), all allegations of fraud must be stated with particularity. Under Fifth Circuit precedent, pleading fraud with particularity sufficient to satisfy Rule 9(b) requires the pleader to identify the "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (internal citation omitted). Stated differently, Rule 9(b) requires "the who, what, when, where, and how" of the alleged fraud to be laid out in the complaint. *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003).

Securities fraud claims brought by private litigants are also subject to the pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Section

9

78u-4(b) of the PSLRA requires a plaintiff pleading a false or misleading statement or omission under federal securities law to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). At a minimum, the PSLRA pleading standard incorporates that of Rule 9(b). *ABC Arbitrage Pls. Grp. v. Tchuruk*, 291 F.3d 336, 349-50 (5th Cir. 2002); *see also Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362-63 (5th Cir. 2004).

In order to plead fraud with specificity as required by the PSLRA, the complaint must also "distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud." *Southland*, 365 F.3d at 365 (emphasis in original). Allegations against "Defendants" as a group are not imputable to any particular individual "unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded." *Id.* Thus, allegations that each defendant controlled the contents of and participated in writing a company's SEC filings, reports, and releases, without more, are insufficient to meet the requirements of the PLSRA. *Id.* Similarly, complaints must not engage in "puzzle pleading" by "isolating allegations and elements while leaving it to the [c]ourt to infer a connection," as "it is the parties' burden to present succinct pleadings which clearly lay out" the required elements – a court is not required to "waste its resources attempting to construe which statements are actionable and why each is actionable." *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 857-58 (N.D. Tex. 2005).

The PSLRA also requires that the plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," frequently referred to as the

defendant's scienter. 15 U.S.C. § 78u-4(b)(2); *Southland*, 365 F.3d at 363. Scienter under the PSLRA means an "intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers . . . is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* at 366 (citation omitted). Severe recklessness "is 'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir. 2002) (citation omitted).

The facts as alleged by plaintiffs must give rise to a "strong inference" of scienter, which "must be more than merely plausible or reasonable–it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). In evaluating scienter, a court "must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Id.* at 314. Further, "the allegations should not be read in isolation, but taken together as a whole to see if they raise the necessary strong inference of scienter," considering "whether all facts and circumstances 'taken together' are sufficient to support the necessary strong inference of scienter on the part of the plaintiffs." *Abrams*, 292 F.3d at 431 (citation omitted). "Properly pleaded circumstantial evidence will suffice to withstand dismissal if the circumstantial evidence justifies a strong inference of scienter," but a court "will not strain to find inferences favorable to the plaintiffs" when determining whether scienter allegations have been sufficiently pleaded. *In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832, 843 (N.D. Tex. 2005) (citing

11

*Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 424-25 (5th Cir. 2001) and *Goldstein v. MCI WorldCom*, 340 F.3d 238, 244 (5th Cir. 2003)).

## III.

## ANALYSIS

Defendants filed their motions to dismiss on June 20, 2012, each asserting multiple grounds for dismissal of the Amended Complaint. The Court examines those arguments next along with the Plaintiffs' corresponding responses. First, for clarity and because the four motions to dismiss contain substantially similar arguments challenging the sufficiency of the Plaintiffs' pleadings, instead of analyzing each ground for dismissal motion-by-motion, four times over, the Court has, to the extent possible, arranged its analysis by topic of dismissal (*i.e.*, group pleading, scienter, etc.) and grouped each of the Defendant's arguments under each topic. With respect to Temple-Inland and Jastrow, because certain of their arguments apply uniquely to them, these arguments are addressed separately.

Before the Court begins its analysis, it is important to note that there has been a shift in Plaintiffs' position in this case. Specifically, in response to Defendants' motions to dismiss, Plaintiffs withdrew one of their primary grounds for recovery and, in so doing, rendered moot significant portions of Defendants' motions to dismiss. *See* Pls.' Resp. 73-74. More to the point, Plaintiffs, in their Amended Complaint, rely on two "cornerstone" allegations against the Defendants in this case. One is their allegation is that Defendants failed to comply with Generally Accepted Accounting Principles ("GAAP") in the valuation of Guaranty's MBS portfolio and thereafter reported fair values and unrealized losses that were materially false. Their other cornerstone allegation, which they now disavow, is that during the Class Period the Defendants falsely reported that nearly half of Guaranty's MBS portfolio were "senior tranche." *See* FAC ¶¶ 59, 110, 116, 126, 130, 136, 145, 149, 162, 165,

173, 175, 196.  By withdrawing their senior tranche theory, Plaintiffs have eliminated significant portions of the Defendants' arguments from consideration,[10] though they have not necessarily rendered the Court's task any simpler. As will be addressed next, Plaintiffs' extensive reliance upon group and puzzle pleading and their repeated use of conclusions framed as facts have hindered the Court's ability to discern the viability of the Amended Complaint under Rule 9(b) and the PSLRA.

A.          *Group and Puzzle Pleading as to all Defendants*

Despite the withdrawal of one of their cornerstone allegations, Plaintiffs' Amended Complaint remains deficient in several respects under Rule 9(b) and the PSLRA due to an overall lack of clarity in pleading – commonly described as the use of "group" and "puzzle" pleading. For example, numerous references to non-party "Guaranty" or to the generic "Defendants" generally – as the parties responsible for the allege false and fraudulent statements – are found throughout the operative complaint,[11] leaving it to the Court to guess which of the Individual Defendants Plaintiffs refer to by these non-specific labels. Moreover, the numerous references to "Guaranty" and "Defendants" combined with the sheer breadth of the Plaintiffs' Amended Complaint, spanning eighty pages, compounds the difficulty of discerning with any precision exactly who did what to

---

[10] Confusingly, while Plaintiffs withdraw the "senior tranche" allegations, they nevertheless appear to qualify the withdrawal with the statement "it nonetheless remains true that only two of the Bank's many MBS tranches were the *most* senior and that Defendants used the 'senior' status of the Bank's MBS portfolio, and the triple A rating of that portfolio, to disguise the known, inflated value of that portfolio in violation of Section 10(b) and 10b-5." Pls.' Resp. 73-74 (emphasis in original) (citation omitted).

Whether this is meant to indicate that Plaintiffs continue to rely upon the senior tranche statements as a basis for recovery on a different theory than that originally advanced is unclear. Nonetheless, this vague statement is wholly insufficient to serve as the basis for a new theory of recovery involving the senior tranche statements.

[11] *See* FAC ¶¶ 35, 40-41, 47-48, 50-53, 57, 59, 62, 65, 78-79, 87, 92, 94-95, 98, 102, 106-07, 110, 126, 128, 130-31, 145, 150, 161-62, 172-73, 192-204, 207, 210-14, 217.

whom, how they did it, and, importantly, how the pleader knows they did what the pleader says they did – all essential requirements of pleading securities fraud.

Further, seventy pages of the Amended Complaint are devoted to what Plaintiffs describe as their "Substantive Allegations" while only two pages describe their actual causes of action under the federal securities laws. Given the length of the allegations and the exacting pleading standards for PSLRA cases, the parties were directed to submit a chart to aid the Court's determination of whether the Plaintiffs' voluminous pleadings satisfy the standards for securities fraud cases. *See* Chart to Aid the Court in Considering Defendants' Motions to Dismiss the Claims filed Nov. 21, 2012 (the "Chart"). Toward that end, the Chart was supposed to provide a breakdown of the Plaintiffs' pleadings organized under specific categories of PSLRA and Rule 9(b) pleading requirements. The information contained in the Chart, ideally, should correspond with the actual allegations in the Amended Complaint.[12] However, the Chart submitted, rather than aiding in the Court's analysis of the legal sufficiency of the Amended Complaint, instead confirms its shortcomings.  For example, the Chart reveals that numerous allegations of the Amended Complaint which appear to be

---

[12] The Court's June 20, 2012 Order stated, *inter alia*,:

The purpose of the Chart is to clearly set forth (1) the fraudulent allegations that Defendants claim are not adequately pleaded; (2) the reasons why Defendants contend the allegations are inadequate; and (3) the reasons why Plaintiffs contend the allegations are adequately pleaded.  As such, the Chart should resemble the following, with one row devoted to each allegedly inadequately pleaded statement:

| Citation to Complaint | Inadequately Pleaded Fraudulent Statements | Why Such Statements Are Not Adequately Pleaded | Why Such Statements Are Adequately Pleaded |
| --- | --- | --- | --- |
| | | | |

Defendants are responsible for filling out the first three columns of the Chart. Plaintiffs are responsible for filling out the final column of the Chart explaining why the fraudulent allegation is sufficiently pleaded.

allegations of false statements by the Defendants are, in fact, not intended to be considered actionable conduct. Replete through the Chart is the refrain by Plaintiffs that much of the conduct referred to in their Amended Complaint under their "Substantive Allegations" category "neither alleges nor purports to allege any fraudulent statement." *See generally* Chart (addressing FAC ¶¶ 1-113, 114,116, 117, 125, 126, 135, 136, 140, 141, 145, 149, 150, 151, 152, 153, 154, 155, 161, 162, 166, 167, 172, 173, 175, 176-191, 192-201, 202-204, 205-06, 207). In other words, from the Chart and only from the Chart – as opposed to the Amended Complaint – can the Court glean that numerous of Plaintiffs' self-described "Substantive Allegations" are *not* intended to be actionable at all.

A further review of the Chart underscores the problem, discussed above, caused by Plaintiffs' sweeping references to non-party "Guaranty" or to the "Defendants" generally – as opposed to naming specific individuals – in the Amended Complaint. Specifically, certain paragraphs of the Amended Complaint name "Guaranty" as the maker of certain false statements, while Plaintiffs then appear to clarify in the Chart that those statements are, in fact, attributable to specific individuals. By way of example, in paragraph 118 of the Amended Complaint, Plaintiffs identify "Guaranty" as the maker of particular statements. Later, Plaintiffs, in the Chart, refer to paragraph 118 and specify "Dubuque and Murff" as makers of the statements. This same confusing scenario is played out in other paragraphs of the Amended Complaint including paragraph 124, where the Amended Complaint refers to "Guaranty" as the party responsible for the statement at issue, but the Chart identifies "Dubuque and Murff" as the responsible parties. In other words, the Amended Complaint reflects numerous statements attributed to "Guaranty" whereas the Chart, in several places, identifies specific individuals as responsible for making those statements. Obviously, Plaintiffs may not amend

15

their Amended Complaint through the use of the Chart, and the Court may not consider allegations not pleaded in the operative complaint.

Finally, as mentioned above, Plaintiffs have, since the filing of the motions to dismiss, withdrawn a cornerstone allegation in their case – the senior tranche allegation, repeated through the complaint – further hindering the Court's ability to assess the viability of Plaintiffs' Amended Complaint under Rule 9(b) and the PSLRA.

For the reasons stated above, the Court **DISMISSES** the Amended Complaint due to impermissible group and puzzle pleading. The Amended Complaint, standing alone, simply does not sufficiently allege each Defendant's role in the alleged fraud and requires the Court to piece together its allegations in order to determine what the false and misleading statements were, why they were false and misleading, and who made the statements. Out of an abundance of caution, and in order to further refine the pleadings, the Court will now address other arguments made in support of Defendants' Motions to Dismiss. In doing so, the Court relies on the additional clarification provided by Plaintiffs' Response while noting that Plaintiffs may not amend their complaint through such pleading.

B.    *Did Temple-Inland or Jastrow "Make" the Statements at Issue?*

1.    Temple-Inland

Plaintiffs seek to hold Temple-Inland liable for alleged misstatements contained within Guaranty's Form 8-K filed on December 14, 2007, which included an Information Statement describing the details of the Spin-Off and providing information about Guaranty.[13] *See* Pls.' Resp;

---

[13]The Amended Complaint also alleges that "[a] prior version of the Information Statement, which was subject to completion, was incorporated into the Form 10 registration statement associated with the Spin-

FAC ¶ 114. Plaintiffs claim that this Information Statement is false and misleading because it fails to disclose that:

> (b) the Bank employed flawed asset pricing models that materially overstated the value of the MBS portfolio and created a false impression about the financial solvency of the Company;
> (c) the Company's financial reporting misrepresented the true fair value of the Bank's MBS portfolio;
> (d) the Company's financial reporting misrepresented its true financial condition, liquidity, capital and ability to satisfy its future debt obligations as they matured;
> (e) the Company, through the Bank, was engaged in unsafe and/or unsound banking practices; and
> (f) the Company's financial statements were not fairly presented in conformity with GAAP.[14]

FAC ¶¶ 115-16. In response, Temple-Inland argues, *inter alia*, that even assuming the statements were false and misleading, it did not "make" the alleged misstatements and thus may not be held liable for them.

Under Rule 10b-5, it is unlawful for "any person, directly or indirectly . . . [t]o make any untrue statement of a material fact" in connection with the purchase or sale of securities. 17 C.F.R. § 240.10(b)-5. The maker of a statement "is the entity with authority over the content of the statement and whether and how to communicate it." *Janus Cap. Grp., Inc. v. 1st Derivative Traders*, 131 S. Ct. 2296, 2303 (2011). In the context of a public SEC filing, the entity that "bears the statutory obligation to file" and that the SEC has recorded as filing the document ordinarily "makes"

---

Off." FAC ¶ 114. This earlier version was apparently made prior to the Class Period and accordingly is nonactionable.

[14]Plaintiffs also alleged that the Information Statement failed to disclose that "nearly one-half of the Company's MBS portfolio was subordinated Junior MBS that were subject to significantly greater risk of loss and possessed lower subordination levels than senior tranche MBS," FAC ¶ 116(a), though Plaintiffs have since withdrawn any allegations that Defendants mischaracterized certain tranches as senior. Pls.' Resp. 73-74.

the statements. *Id.* at 2304-05. Further, assisting in creating or drafting a false statement does not subject the drafter to Rule 10b-5 liability, as it is only the speaker who has "ultimate authority over the statement," and therefore makes the statement.[15] *Id.*

Even assuming that the alleged misstatements in the Information Statement are false, Temple-Inland may not be held liable for any of these statements, as it did not make them as required by *Janus*. In making this determination, the Court rejects Plaintiffs' "adoption" theory of liability as applied to this case, based on *Janus*. In *Janus*, the United States Supreme Court held that because allegedly false statements included in mutual fund prospectuses were made by an investment *fund*, the investment *adviser* which also acted as administrator for the investment fund could not be held liable even though the adviser may have may taken part in the drafting of the prospectuses.[16] The court explained:

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by— the party to whom it is attributed. This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control

---

[15]Plaintiffs explain that they do not seek to hold Temple-Inland liable by virtue of its corporate relationship with Guaranty. Pls.' Resp. 32. Further, even assuming that Temple-Inland controlled Guaranty, Plaintiffs have not alleged that Temple-Inland had ultimate authority over the Information Statement. *See, e.g.*, *Kerr v. Exobox Techs. Corp.*, No. H-10-4221, 2012 WL 201872, at *11 (S.D. Tex. Jan. 23, 2012) (plaintiff has to show that defendant had ultimate control over the statements at issue, and "just because a person or entity may 'control' the company filing the document does not mean that the control person can be liable under 10b-5 for making the statements" (citing *Janus*, 131 S. Ct. at 2302)).

[16]The court did not directly address the issue of whether the investment adviser's parent capital group, which created the mutual funds at issue, could be held directly liable under Rule 10b-5. 131 S. Ct at 2299-2301.

of the person who delivers it. And it is the speaker who takes credit—or blame— for what is ultimately said.

*Id.* at 2302. Thus, the court explained that providing online access to the investment fund's prospectuses was not a basis for liability:

> Merely hosting a document on a Web site does not indicate that the hosting entity adopts the document as its own statement or exercises control over its content. In doing so, we do not think [the investment adviser] made any of the statements in [the investment fund's] prospectuses for purposes of Rule 10b-5 liability, just as we do not think that the SEC 'makes' the statements in the many prospectuses available on its Web site.

*Id.* at 2305 n.12 (citation omitted).

Here, the Information Statement contained within the December 14, 2007 Guaranty Form 8-K, while on Guaranty letterhead and filed by Guaranty, was preceded by a letter in Temple-Inland stationery and signed by Defendant Jastrow (the "Jastrow Letter"), who was Chairman and CEO of Temple-Inland.[17] Defs.' App. Supp. Mot. Dismiss 527-34 ("Defs.' App."). The Jastrow Letter is addressed to Temple-Inland stockholders and describes Temple-Inland's plan to separate Temple-Inland into three stand-alone public companies. *Id.* at 531. Further, the Letter refers shareholders to the Information Statement, stating, "[t]he enclosed information statement, provided to all Temple-Inland stockholders, describes the spin-off of Guaranty." *Id.*

While this is a closer case than *Janus*, Plaintiffs have not sufficiently alleged that Temple-Inland "made" any of the alleged misstatements contained within the Information Statement. As in *Janus*, there is no allegation that Temple-Inland filed the Form 8-K or falsely attributed the Form 8-K to Guaranty. *See Janus*, 131 S. Ct. at 2305. Rather, the Form 8-K was filed by Guaranty and signed

---

[17]The Information Statement was also preceded by a Guaranty cover letter, which Jastrow signed in his capacity as Chairman of the Board of Guaranty Financial Group. *See* Defs.' App. 532.

by Scott A. Almy, Guaranty's Executive Vice President.[18] Defs.' App. 529. Further, as in *Janus*, the corporate formalities appear to have been observed, and Plaintiffs do not claim otherwise. *See Janus*, 131 S. Ct. at 2304. While the *Janus* court leaves open the possibility that a company could adopt a document as its own and be subject to liability thereby, *id.* at 2305 n.12, neither inclusion of the Jastrow Letter with the Information Statement nor the forwarding of these materials to Guaranty shareholders transforms Temple-Inland into a "maker" of the Information Statement under federal securities law. Simply put, Plaintiffs have not alleged that Temple-Inland had ultimate authority over the Information Statement such that it could be liable for any misstatements contained within it. Under the facts as alleged by the Amended Complaint, and under *Janus*, any misstatements or omissions in the Information Sheet were "made" by Guaranty, not Temple-Inland. As Temple-Inland did not make any of the allegedly fraudulent representations, it cannot be held liable for them. Accordingly, Temple-Inland's Motion to Dismiss is hereby **GRANTED** to the extent it seeks dismissal of Plaintiffs' s Section 10(b) and Rule 10b-5 claim against Temple-Inland based on failure to allege that Temple-Inland made any of the misstatements at issue. Count I[19] is hereby **DISMISSED WITHOUT PREJUDICE** as to Temple-Inland.[20]

Although the Court does not dismiss the claims against Temple-Inland with prejudice, the Court is dubious that any future amended complaint would cure the deficiencies listed above, in light

---

[18]The Information Statement itself was not signed by anyone, nor is it attributed to any particular author.

[19]The Amended Complaint asserts Count II, Section 20(a) control person liability, against the Individual Defendants only.

[20]Temple-Inland also raises other arguments in support of its motion to dismiss. The Court will examine some of these arguments later in this opinion as potential additional grounds for dismissal of Plaintiffs' claims against Temple-Inland.

of *Janus*. As such, the Court **DENIES WITHOUT PREJUDICE** Plaintiffs' request[21] for leave to amend its complaint as to Temple-Inland at this time. *See Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000) (court is not required to grant leave to amend if the defect is "simply incurable"). Should Plaintiffs wish to replead as to Temple-Inland, they must file a motion for leave to amend in accordance with the Local Rules and the Federal Rules of Civil Procedure.

2.     Jastrow

Jastrow[22] argues that as an outside director of Guaranty, he may not be held liable for statements made by Guaranty or the Individual Defendants. The only representations the Amended Complaint specifically links to Jastrow are statements made by Jastrow during a conference call which preceded the Class Period; Guaranty's December 14, 2007 Form 8-K, which included the Information Statement with the Temple-Inland cover letter signed by Jastrow on behalf of Temple-Inland and Guaranty's cover letter signed by Jastrow and Dubuque; and Guaranty's 2007 Form 10-K, filed on Feb. 29, 2008 and signed by Jastrow.[23] FAC ¶¶ 35, 107-110, 114, 131. With respect to the conference call, as discussed previously, a defendant may not be held liable for pre-Class Period statements, and Plaintiffs do not seek to hold Jastrow liable for such statements. *See* Pls.' Resp. 34.

---

[21]Plaintiffs did not formally move for leave to amend but requested such leave in their Response to Defendants' Motions to Dismiss. Pls.' Resp. 74.

[22]As alleged by the Amended Complaint, Defendant Jastrow was CEO of Temple-Inland and Chairman of its Board of Directors until December 28, 2007. Jastrow simultaneously served as Chairman of the Board of Directors of Guaranty and the Bank until he retired from such roles on August 26, 2008. FAC ¶ 9.

[23]Although the parties have only included excerpts of Guaranty's 2007 10-K, the Court takes judicial notice of the entire 2007 10-K, including its signature page at page 97, which contains Jastrow's signature as "Director, Chairman of the Board," along with the signatures of Dubuque, Murff, Gifford, and other directors.

With respect to the 8-K and the 10-K, Jastrow signed these documents in his capacity as an outside director, specifically Chairman of the Board of Directors of Guaranty. Jastrow cites a case outside of the Fifth Circuit for the proposition that outside directors "cannot be assumed to have assisted in preparing, reviewing, or approving offering materials . . . even when an outside director's name or signature appears in a company statement." *See In re Nat'l Century Fin. Enters.*, 504 F. Supp. 2d 287, 298 (S.D. Ohio 2007). In Jastrow's view, given that he is an outside director, he may not be held liable for statements within those documents without specific allegations describing his role in creating the documents at issue. Jastrow also argues that the same rule is required under *Janus*, given his contention that outside directors of a company cannot be assumed to have ultimate control over that company's statements.

Although this question has not been squarely addressed by the Fifth Circuit, the weight of authorities within the Fifth Circuit indicates that an outside director's signature on a document is sufficient to make him liable for any false or misleading statements within that document.[24] In *Southland*, for example, the Fifth Circuit explained:

> [C]orporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded. However, corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue. Such specific facts tying a corporate officer to a statement would include *a signature on the document* or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement.

---

[24]Of course, a plaintiff must allege an outside director's scienter and meet all the other requirements of the PSLRA.

365 F.3d at 365 (emphasis added). The court in *Financial Acquisition Partners LP v. Blackwell*, similarly held that "[c]orporate statements can be tied to officers if plaintiffs allege they signed the documents on which the statements were made or allege adequately their involvement in creating the documents." 440 F.3d 278, 287 (5th Cir. 2006) (citing *Southland*, 365 F.3d at 364-65). Defendants make much of the fact that the *Southland* and *Blackwell* courts discussed the signatures of officers but not outside directors. However, some courts within the Fifth Circuit have explained that both directors and officers may be held liable for corporate statements if they signed the document containing the statements. *See, e.g., In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 779 (S.D. Tex. 2012) (citing *Southland* and *Blackwell*). Another court highlighted the significance of an outside director's signature, explaining:

> Outside Directors assert that this Court previously noted the limited significance of an outside director's signature on an SEC filing in *In re Enron* [*Corp. Sec., Derivative & ERISA Litig.*], 258 F. Supp. 576, 588 (S.D. Tex. 2003) . . . . This Court completely disagrees; in fact its discussion emphasizes exactly the opposite, *i.e.*, that "the SEC has attempted to make signatures on corporate documents that are filed with the SEC carry significant weight."

*In re Enron Corp. Sec., Derivatives & "ERISA" Litig.*, 540 F. Supp. 2d 800, 819 n.19 (S.D. Tex. 2007) (other citation omitted). As such, the Court **DENIES** Jastrow's Motion to Dismiss to the extent it seeks dismissal of Plaintiffs' claims against him based on their failure to allege, in addition to his signature, Jastrow's specific involvement in the filings at issue. Such determination is in keeping with *Janus*—by signing a corporate document, the signer is stating to the world that he, with other signers, is jointly making the statements within the document. Thus Jastrow may be liable for any misstatements within Guaranty's December 14, 2007 Form 8-K and Guaranty's 2007 Form 10-K as a "maker" of the statements under *Janus*.

23

The Court also recognizes that Jastrow's signature contained within the December 14, 2007 Form 8-K is on a Guaranty cover letter preceding the Information Sheet containing the alleged misstatements, and not on the Information Statement itself. The Information Statement itself is not attributed to any author. Nevertheless, Jastrow signed the cover letter in his capacity as Chairman of the Board of Directors of Guaranty. As such, Jastrow is acting as a maker of the Information Statement under *Janus*, in contrast to the Temple-Inland cover letter which merely forwarded another corporation's document.[25]

C.     *Were the Statements by Any of the Defendants False or Misleading?*

In order to plead securities fraud based on misstatements or omissions, a plaintiff must identify the statements at issue and allege that they were false or misleading when made. All Defendants argue that the Amended Complaint does not allege with specificity any false or misleading statements. The Court will examine whether the Amended Complaint pleads that Guaranty or any of the Individual Defendants made false or misleading statements below.

1.     Alleged GAAP Violations

All Defendants argue that the Amended Complaint does not allege any GAAP violations by them or Guaranty. In response, Plaintiffs argue that the Amended Complaint alleges that Defendants violated GAAP when they knowingly overstated fair values and understated unrealized losses on the Company's MBS portfolio, failed to timely record an OTTI in the value of the Company's MBS, and failed to disclose material events about the diminution in the value of the MBS portfolio between

---

[25]Jastrow also signed the Temple-Inland cover letter in his capacity as Chairman and CEO of Temple-Inland. Jastrow is not liable for any misstatements contained in the Information Statement based on his signature on the Temple-Inland cover letter for the same reasons that Temple–Inland may not be held liable.

December 31, 2007 and the filing of the 2007 Form 10-K. FAC ¶ 48. The Amended Complaint also

states that Guaranty was using a flawed pricing model to value its portfolio, because:

> (i) it mischaracterized nearly half of the MBS portfolio as senior tranche securities, which resulted in materially misstated inputs being recorded in Guaranty's asset pricing models; (ii) the Bank did not model for loan credit risk until sometime in 2008; (iii) the asset pricing model incorporated outdated "parameters"; (iv) the cash flow data used in valuing the MBS portfolio was assumed and not independently verified; (v) liquidity factors were eliminated in valuing the MBS; (vi) the Bank did not model for loans in the portfolio on an individual basis; and (vii) the MBS pricing model failed to account for the changes in interest rate spreads on adjustable rate mortgages and only modeled the loan interest rate caps at the time the securities were purchased.

FAC ¶ 52.

The Amended Complaint further claims that Guaranty violated GAAP by failing to record

an OTTI in its MBS portfolio of at least $483 million by no later than June 30, 2008. *Id.* at ¶¶ 80-

106. In Plaintiffs' view, Guaranty was required to record an OTTI as "[t]he massive diminution in

the value of, and the significant increase in the rate of average delinquencies on, Guaranty's MBS

portfolio" were "red flags" indicating to the Defendants that Guaranty "would not be able to collect

all amounts due on its MBS portfolio in accordance with their contractual terms, which rendered

such investments impaired on an other-than-temporary basis pursuant to GAAP," in addition to the

downgrading or placement on negative watch of Guaranty's MBS as additional red flags. Defs.' Resp.

25-26 (citing FAC ¶ 92, 94). In their view, such alleged failure to record the required OTTI led to

a corresponding overstatement of Guaranty's income, retained earnings, and regulatory capital no

later than June 30, 2008.[26] FAC ¶ 95.

---

[26]Plaintiffs also point to the OTS's restatement of Guaranty's March 2009 Thrift Financial Report regulatory filing to reflect a $1.45 billion OTTI on the MBS portfolio as an indication of Guaranty's failure to follow GAAP. Pls.' Resp. 29 (citing FAC ¶¶ 47).

Finally, Plaintiffs argue that Guaranty violated GAAP by failing to disclose material subsequent events. They point to Guaranty's 2007 10-K filed February 29, 2008, which disclosed that Guaranty had a combined unrealized loss totaling $274 million in 2007, when the actual loss was actually much greater, and which purportedly failed to disclose that the unrealized loss on the MBS portfolio, as determined by Guaranty, had increased by hundreds of millions of dollars since December 31, 2007 (citing FAC ¶ 103), given that 31 days later, Guaranty reported that the cumulative unrealized loss on its MBS portfolio totaled $1.070 billion, four times the amount reported at December 31, 2007. FAC ¶¶ 102-105.

The Court first notes that several of the allegations regarding Guaranty's purported GAAP violations are based on statements of confidential witnesses, who were directors or vice presidents of Guaranty.[27] In asserting securities fraud under the PSLRA, plaintiffs may rely on confidential

---

[27]The Amended Complaint alleges that:

CW1 is a former Bank Senior Vice President of Investments employed with the Bank from 1990 to late 2008. Among other things, CW1 was responsible for purchasing mortgage backed securities at the direction of [Randall D.] Levy. CW1 was the Secretary of the Bank's Asset Liability Committee and regularly attended its meetings.

CW2 is a former Bank Director of Quantitative Analysis employed at the Bank from 2005 through 2009. Among other things, CW2 had responsibility for the valuation of the Bank's MBS portfolio and its asset/liability management.

CW3 is a former Guaranty Senior Vice President of Marketing employed with the Company from 2006 through late 2008. CW3 had responsibilities associated with Guaranty's public relations and marketing communications.

CW4 is a former Bank Executive Vice President employed with the Bank from 1998 to 2009. CW4 held a number of different positions with the Bank, including those with responsibilities for the Bank's residential real estate portfolio and its loan operations.

CW5 is a former Bank Senior Executive Vice President, Chief Lending Officer and Chief Administrative Officer employed with the Bank from 1991 through the end of 2008. CW5 was responsible for overseeing the Bank's lending activities, including real estate, commercial, and mortgage wholesale lending.

FAC ¶¶ 23-27 (internal paragraph numbering omitted).

witnesses without naming the witnesses, "provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *ABC Arbitrage Pls. Grp. v. Tchuruk*, 291 F.3d 336, 352 (5th Cir. 2002).[28] As pleaded by the Amended Complaint, Plaintiffs have described the confidential witnesses they relied upon with sufficient particularity such that they need not be named. CW1, for example, purchased MBS on behalf of Guaranty and was the Secretary of Guaranty's Asset Liability Committee ("ALCO"), and Plaintiffs allege that the proper valuation of MBS was discussed at the ALCO meetings. As another example, CW2 was responsible for valuation of Guaranty's MBS portfolio, which is at the center of Plaintiffs' claims.[29] Thus, the Court considers the allegations of the confidential witnesses in assessing Plaintiffs' claims.

In response to these allegations of GAAP violations, Defendants collectively argue that determinations of the fair value of MBS and whether to record an OTTI in the value of the MBS involve a great deal of judgment and that GAAP does not prescribe any one way of performing such valuation. *See, e.g., Thor Power Tool Co. v. C.I.R.*, 439 U.S. 522, 544 (1979) (GAAP "tolerate[s] a range of 'reasonable' treatments, leaving the choice among alternatives to management"); *Ind. Elec.*, 537 F.3d at 536 ("Valuations of assets, . . . as well as the application of sophisticated accounting

---

[28]*ABC Arbitrage* also explains that "[i]f plaintiffs rely on confidential personal sources and other facts, their sources need not be named in the complaint so long as other facts, *i.e.*, documentary evidence, provide an adequate basis for believing that the defendants' statements or omissions were false or misleading." 291 F.3d at 353 (citation omitted).

[29]The Court notes, however, at least with respect to allegations regarding scienter, courts must "discount" allegations from confidential sources. *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) ("That these allegations derive from confidential sources further detracts from their weight in the scienter analysis.").

standards like 'fair value,' leave broad scope for judgment and informed estimation; this is another way of saying that determinations on such matters can differ reasonably and sizably." (citations omitted)). In their view, Plaintiffs have only alleged that certain confidential witnesses would have valued the MBS differently or would have recorded an OTTI, but neither result was required by GAAP. Defendants also argue that Plaintiffs have not alleged GAAP violations with specificity, specifically what the value of the MBS was when it was purportedly overstated, when an OTTI should have been recorded, and what the magnitude of the OTTI was.

Recognizing that GAAP rules regarding determinations of fair value and whether to recognize an OTTI require judgment calls, the Court finds that the issue of whether Guaranty violated GAAP is not appropriate for disposition on Defendants' Rule 12 motions. *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257 (5th Cir. 2005) (in securities fraud case where parties disputed whether defendants' accounting methods were proper, dismissal of case on motion to dismiss was inappropriate given the fact-based nature of the defense); *but see In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 550-54 (N.D. Tex. 2003) (finding that complaint did not allege facts which showed that defendant violated GAAP). Plaintiffs allege, for example, that Guaranty failed to follow GAAP based on FAS No. 115 and FAS No. 124, which state that in assessing whether a security suffered an OTTI, "[i]mpairment shall be assessed at the individual security level" and a statement from a confidential witness that during Class Period, Guaranty did not assess MBS losses at the individual loan level. *See* FAC ¶¶ 84-85. Taking this allegation as true, Plaintiffs have alleged that this practice violated GAAP. The Court notes the parties' extensive briefing on other alleged practices in connection with the valuation of Guaranty's MBS, but also finds that the determination of whether these practices violated GAAP is not appropriate at this time. Thus, to the extent

28

Defendants seek dismissal of the Amended Complaint based on failure to allege GAAP violations, the motions are **DENIED**.

2.     Allegedly False Financial Figures

The Court reaches a different conclusion, however, with respect to Plaintiffs' allegations that Guaranty understated its losses, overstated the value of its MBS, and failed to properly record an OTTI in 2008. Plaintiffs themselves state that "[t]he whole thrust of the Complaint . . . is that the Bank misrepresented the value of its MBS portfolio and failed to record OTTI that it was required to record." Pls.' Resp. 38 n.29. Unfortunately, their allegations regarding what the actual valuations of the MBS portfolio were, when an OTTI should have been recorded, and what the magnitude of the OTTI should have been are simply not specific enough to show that Guaranty reported false or misleading financial figures.

The Amended Complaint states that Guaranty's MBS portfolio suffered a nearly half billion OTTI no later than June 30, 2008 and that Guaranty's failure to record this OTTI resulted in an overstated value of its MBS portfolio and an understated figure for Guaranty's losses. *See, e.g.*, FAC 199. However such allegations do not indicate what the MBS valuation should have been when the purported misstated values were reported. As explained by one court in this District,

> [I]if an allegation is made that Defendants falsely 'overstated their net income' . . . supporting facts, if any exists, would not be difficult to set forth. All one has to do is state that for the first quarter of 1997, or whatever the relevant period, Defendants represented that their net income was "X amount" when in fact its net income was 'Y amount,' and, of course, if the 'Y amount' alleged is based on information and belief, state with particularity the facts which support that belief.

*In re Capstead Mortg.*, 258 F. Supp. 2d at 550. Another court explained that the plaintiff failed to allege with specificity how a Form 10-K was misleading with respect to cost overruns because, *inter*

29

*alia*, the plaintiff did "not allege how large the overruns were at the time of the filing of the Form 10-K." *Magruder v. Halliburton Co.*, Civ. Action No. 3:05-cv-1156-M, 2009 WL 854656, at *22 (N.D. Tex. Mar. 31, 2009) (citing *Ind. Elec.*, 537 F.3d at 536 (holding that "plaintiffs cannot make allegations that strongly support the defendants' guilty knowledge of securities fraud . . . by throwing out large numbers with no factual basis for ascertaining what the 'truth' was")). This case is similar to *Indiana Electrical*. After first noting the complaint's "voluminous citations to accounting rules," 537 F.3d at 535, the court explained that while plaintiffs alleged devices that allowed the defendant to "pad its earnings, massively, *they make no attempt to estimate by how much the earnings were inflated.* There is no standard of comparison to what the correct numbers would have been." *Ind. Elec.* at 536 (emphasis added). Here, without stating what the correct numbers would be in the 2007 10-K, for example, Plaintiffs focus on statements by confidential witnesses to show that the process for generating the numbers in the 10-K was flawed, and then repeat the half a million OTTI figure that they claim should have been recorded by June 2008. Such allegations are not sufficient to show with specificity that the statements containing the purported inflated figures were false when made. Similarly, allegations that Guaranty misrepresented its "true financial condition, liquidity, capital, and ability to satisfy its future debt obligations" and omitted material facts regarding its "unsafe and/or unsound banking practices," are not specific enough to show that Guaranty made false statements. *See* FAC ¶ 116(d)-(e).

The Court also finds that the Amended Complaint fails to plead that Guaranty made a false statement or omission based on Guaranty's failure to record an OTTI no later than June 2008 and based on Guaranty's restatement in March 2009 which reflected a $1.45 billion OTTI. While the Court has already determined that the issue of whether Guaranty violated GAAP is not appropriate

for resolution on a Rule 12 motion, stating that Guaranty should have recorded an OTTI no later than June 2008 and that Guaranty should have recorded the $1.45 billion OTTI earlier is not specific enough to show that Guaranty's financial statements were false when made. While the Court recognizes that discovery has been stayed pursuant to the PSLRA, Plaintiffs must allege what they believe the actual figures should have been in the statements alleged to be false, and the Amended Complaint does not allege those facts. As such, to the extent that Defendants seek dismissal of the Amended Complaint's claims which are based on false or misleading financial figures, the motions are **GRANTED**. The Amended Complaint's claims based on false or misleading financial figures are **DISMISSED**.

### 3. Other Alleged Misstatements

The Amended Complaint's pleadings regarding Guaranty's and the Individual Defendants' representations that its MBS was senior tranche and AAA rated are also insufficient to allege that such statements were false or misleading. Plaintiffs now recognize that Guaranty's MBS were characterized in their prospectuses as senior tranche but still seem to argue that such representations were misleading, given that "in many instances, they are far from the most senior, and have as many as 22 layers of higher priority above them" and that "it nonetheless remains true that only two of the Bank's many MBS tranches were the most senior and that Defendants used the 'senior' status of the Bank's MBS portfolio, and the triple A rating of that portfolio, to disguise the known, inflated value of that portfolio in violation of Section 10(b) and Rule 10b-5." Pls.' Resp. 73-74 (citations omitted). However, the Amended Complaint does not properly allege that this characterization was material or misleading. Even though the MBS may not be the most senior tranche, there is no allegation that the most senior tranche is the only tranche that is properly considered senior. There are also

31

insufficient allegations to indicate that the Individual Defendants knew or should have known that Guaranty's MBS, while AAA rated by independent rating agencies, should not have in fact been rated AAA.[30] As such, the Amended Complaint does not sufficiently allege that Defendants' statements describing their MBS as senior tranche or AAA rated were false or misleading when made.

In light of the foregoing, Defendants' Motions to Dismiss, to the extent they seek dismissal of Plaintiffs' claims based on failure to plead with specificity that Defendants' statements or omissions were false or misleading when made are **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs' Section 10(b) and Rule 10b-5 claims are **DISMISSED WITHOUT PREJUDICE** to the extent they are based on the Amended Complaint's allegations of fraudulent financial figures and Guaranty's or Defendants' representations that Guaranty's MBS were senior tranche or AAA-rated.

D.    *Scienter*

Even assuming that the Amended Complaint properly alleges that Guaranty or the Individual Defendants made material false or misleading statements or omissions, Plaintiffs must allege that such statements were made with scienter, or that Defendants made them with "an intent to deceive, manipulate, or defraud or severe recklessness." *Ind. Elec.*, 537 F.3d at 533 (citation omitted). Under this standard, simple or even gross negligence are insufficient to meet the PSLRA's scienter requirement. *See, e.g., Abrams*, 292 F.3d at 430. The Court will examine whether the Amended Complaint alleges a strong inference of scienter as to each of the Individual Defendants below.

1.    Allegations Common to All Individual Defendants

---

[30]The Court considers the issue of whether Guaranty's MBS should have been rated AAA rated as separate from, although related to, the issue of whether Guaranty was properly valuing its MBS.

Plaintiffs point to general allegations of scienter as to all Defendants, including the magnitude of GAAP violations, corroboration of multiple witnesses, and Defendants' general motive to understate losses so as to maintain minimum regulatory capital requirements and have more time to procure much needed capital.

The Court has already discussed the alleged GAAP violations above and determined that the issue of whether GAAP was violated is not appropriate for resolution at this time. The Court notes, however, that unlike many cases where the company has in effect acknowledged that it did not follow GAAP by restating its financials, here, Guaranty has never restated the MBS valuations and profits and losses at issue, with the exception of the Office of Thrift Supervision's July 2009 restatement of Guaranty's March 2009 Thrift Financial Report reflecting a $1.45 billion OTTI on the MBS portfolio. *See* FAC ¶¶ 47, 186. Even if Guaranty had restated its financials and violated GAAP, though, these types of errors can "easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action," *Abrams*, 292 F.3d at 433, and the alleged violations by Guaranty appear to have been repeated by numerous other companies during the Class Period. At the same time, the failure to record an OTTI of half a million dollars would have a large effect on Guaranty's bottom line, and the OTS's July 2009 OTTI restatement resulted in Guaranty "having negative capital" and seemed to be the "last straw" in Guaranty's long and gradual decline. Given that the issue of whether Guaranty violated GAAP is disputed but the alleged magnitude and extent of the violations is large, the Court finds that this factor contributes to an inference of scienter but, standing alone, does not contribute to a strong inference.

With regard to motive and opportunity, Plaintiffs allege that Guaranty understated its losses so that its minimum regulatory capital requirements would not be breached and so that the company would be afforded time necessary to procure much needed capital via private placement offerings. FAC ¶ 41. Here, Guaranty's survival as a going concern was at stake apparently from the date of the Spin-Off, an allegation supported by the fact that Guaranty's worsening financial situation eventually resulted in its bankruptcy filing. As such, Plaintiffs have alleged more than the general desire to improve financial results. *See In re Cabletron Sys. Inc.,* 311 F.3d 11, 39 (1st Cir. 2002) (serious and worsening deterioration of company's financial health properly alleged motive as "[t]his is more than the usual concern by executives to improve financial results; the executives' careers and the very survival of the company were on the line"). However, the Court also notes that the problem of declining value of MBS was widespread during the Class Period, to the extent that the future of the entire financial sector was seemingly at stake and this motive would be common to virtually every holder of significant amounts of mortgage-backed securities. As such, the Court finds that the Amended Complaint's allegations of motive contribute somewhat to an inference of scienter.[31]

2.      Jastrow's Scienter

---

[31]Plaintiffs also argue that the corroboration of multiple witnesses contributes to an inference of scienter. While corroboration by multiple witnesses regarding what a particular individual knew may contribute to an inference of scienter, the Court cannot infer scienter as to each defendant based on multiple witnesses without specific allegations linking these witnesses to each defendant. Thus, an allegation that three confidential witnesses told Defendant X that a company was violating GAAP raises no inference of scienter as to Defendant Y, absent other allegations that would indicate that Defendant Y received the same information.

Plaintiffs also argue that they have sufficiently alleged the scienter of Jastrow, CEO of Temple-Inland and former Chairman of the Board of Directors of Guaranty.[32] In support of their contention that Jastrow knew Guaranty was making false statements, Plaintiffs argue that: a) Jastrow was apprised of Guaranty's precarious financial situation and the riskiness of its MBS portfolio before the Spin-Off; b) Jastrow opined that the real estate markets in California were deteriorating, partly due to adjustable rate mortgages being reset, coupled with mortgagor difficulties in obtaining refinancing in a tight credit and underwriting market; c) Jastrow noted that the deteriorating market conditions during 2007 had a material adverse effect on the value of the Bank's assets, especially because the underlying mortgages with respect to the Bank's MBS portfolio consisted of a high concentration of California option ARMs, and d) Jastrow tried to distract from the dangers of Guaranty's risky highly MBS-concentrated portfolio by touting the portfolio as "right at AAA." Pls.' Resp. 49-50 (and citations therein). The Court will examine these allegations below.

a) *Jastrow was apprised of Guaranty's precarious financial situation before the Spin-Off.*

The actual allegation in the Amended Complaint referenced by Plaintiffs states that "Defendants knew that the Bank was significantly undercapitalized" and "Temple-Inland determined that the Bank's MBS portfolio would contribute to sustained losses by the Bank, with adverse financial consequences to Temple Inland." FAC ¶ 35. However, such group-pleaded allegations are insufficient to show that Jastrow knew that the Bank was undercapitalized or that the Bank was

---

[32]The Amended Complaint only seeks to hold Jastrow liable for conduct through August 26, 2008, when he retired from his position as Chairman of the Board of Directors of Guaranty. As discussed previously, Plaintiffs seek to hold Jastrow liable for the Information Statement discussing the Guaranty Spin-Off and Guaranty's 2007 Form 10-K. FAC ¶ 9

improperly valuing its MBS portfolio. Further, even assuming that Jastrow knew of Guaranty's financial situation, such knowledge does not lead to the inference that he knew Guaranty was improperly valuing its MBS.

    b)  *Jastrow opined that the real estate markets in California were deteriorating.*

  The Amended Complaint alleges that the Executive Committee of Temple-Inland's Board of Directors held a meeting at which Jastrow "opined that the real estate markets in California were deteriorating, but it does not identify when this meeting allegedly occurred. *See* FAC ¶ 35(a). Nevertheless, the Court does not find that this statement indicates any scienter as to the Bank's allegedly fraudulent accounting practices. Such statement regarding the California real estate market was both publicly known and also acknowledged by Guaranty in its December 14, 2007 Form 8-K. *See* Defs.' App. 10. Further, as discussed by Jastrow, "[t]he issue for scienter purposes is not knowledge of whether the California housing market was deteriorating, but rather knowledge of whether the AAA rated, non sub-prime mortgage-backed securities would deteriorate to such an extent that the Bank would be unable to collect the principal and interest on those securities." Jastrow Mot. Dismiss 8.

    c)  *Jastrow noted that deteriorating market conditions during 2007 had a material adverse effect on the value of the Bank's assets.*

  Although Plaintiffs' Response states that Jastrow made this statement, the Amended Complaint makes this allegation without attributing it to any individual, though it does appear in the Amended Complaint after the allegation regarding Jastrow's statement about the declining real estate market in California. Instead, this statement appears to be Plaintiffs' own statement regarding the California real estate market's effect on the Bank's assets. Even assuming that Jastrow made such a

statement, though, such statement does not lead to the conclusion that Jastrow knew that Guaranty was improperly valuing its MBS or should have recorded a half billion OTTI by June 2008, especially considering that there is no indication that the valuations or impairments in the December 2007 Form 8-K were ever restated.

> d) *Jastrow's statements regarding the AAA rating of its MBS.*

The Court first notes that Plaintiffs concede that Guaranty's MBS portfolio was indeed AAA-rated and have withdrawn their allegations that Defendants made misstatements in characterizing them as senior tranche. Pls.' Resp. 74. Such concession undermines to a significant degree much of the Amended Complaint, given the repeated allegations throughout the complaint that Guaranty falsely characterized them as senior tranche. Further, while Plaintiffs have alleged that various confidential witnesses alerted Guaranty senior management to deficiencies in Guaranty's accounting practices regarding MBS, even assuming these warnings were true and were sufficient to impute scienter on the recipient of these warnings, Plaintiffs do not allege that any of these witnesses shared these warnings with Jastrow specifically. Further, no security in Guaranty's portfolio was put on negative watch or downgraded until months after the documents attributed to Jastrow were filed with the SEC, which also weighs against an inference of scienter. *See* FAC ¶ 93.

> e) *Other factors relevant to Jastrow's scienter.*

At least some courts have distinguished between a corporation's inside directors "who normally participate in its operations and create its policies," and outside directors, "who are supposedly independent and disinterested and who, without a showing that the situation is otherwise, rely on the insiders' disclosure of material information about the corporation's business." *See In re Enron*, 258 F. Supp. 2d at 626 n.55. Here, Plaintiffs have not alleged that Jastrow was more

involved in Guaranty's operations than normal outside directors. As such, Jastrow's position weighs slightly against an inference of scienter.

Overall, the Court finds that the Amended Complaint does not allege a strong inference of scienter as to Jastrow. Allegations showing that Jastrow was aware of the declining housing market and a declining market for MBS as well as Guaranty's need for more capital, in connection with his position as Chairman of the Board of Directors and his signature on certain Guaranty SEC filings, are simply not enough to show that Jastrow knew that Guaranty was reporting false financial figures and violating GAAP. This is especially so considering that the Amended Complaint does not allege that Jastrow specifically heard or saw any of the purported warnings shared with other Guaranty officers or directors. Instead, the more compelling inference is that he did not know of these issues or was only negligent as to them. As such, Jastrow's Motion to Dismiss, to the extent it seeks dismissal of Plaintiffs' Section 10(b) and Rule B-5 claim against Jastrow, is **GRANTED**. Claim I of the Amended Complaint is hereby **DISMISSED WITHOUT PREJUDICE** with respect to Jastrow.

    3.    <u>Dubuque's Scienter</u>

Defendant Dubuque served as the President, CEO, and a director of Guaranty until his resignation from such positions on November 19, 2008. Defendant Dubuque also served as the Company's Chairman from August 26, 2008 through November 19, 2008. FAC ¶ 10. Plaintiffs seek to hold Dubuque liable for his signatures on Guaranty's 2007 10-K and three 10-Qs filed in 2008. *See* Pls.' Resp. 17 n.14 (and citations therein). Plaintiffs point to various allegations which purportedly show his scienter, which the Court will examine below.

    a)    *Dubuque was aware of Bank's dangerously low capital levels.*

38

Plaintiffs point to numerous allegations showing that Dubuque knew Guaranty was undercapitalized. *See*, *e.g.*, FAC ¶¶ 35, 37-39. The Court has already determined that such allegations provide support for Plaintiffs' theory regarding motive. However, such allegations, standing alone, do not support an inference of scienter, as they do not lead to the conclusion that Guaranty was improperly valuing its MBS.

    b)  *Dubuque was aware of Guaranty's deficient pricing models and the overvaluation of the MBS portfolio.*

Plaintiffs point to numerous allegations in support of their allegation that Dubuque knew Guaranty was improperly valuing its MBS, including the Amended Complaint's allegations that:

- ALCO members were "comfortable" with the risks associated with MBS because "they did not want to give up the yield" that would be lost by paying for increased credit enhancement, as discussed at an ALCO meeting prior to the Class Period;

- A confidential witness put a number of Bank executives including Dubuque and Murff on notice about numerous deficiencies in Guaranty's MBS pricing model "on numerous occasions," including a January 2007 email and ALCO meetings attended by Dubuque and Murff, but such concerns were rebuffed by responses that the securities were rated AAA and that the meeting or meetings should move on to other topics.

- Another confidential witness commented that certain ALCO members repeatedly expressed concerns about the MBS portfolio but were ignored, "as no action was taken."

FAC ¶¶ 63-77. As discussed above, the Court previously found that the Amended Complaint sufficiently pleaded at least some violations of GAAP. However, even assuming that GAAP was violated, the above allegations standing alone do not lead to a strong inference of scienter. The communications described in the complaint occurred either several months prior to the Class Period or at some unspecified time. Also, the Court recognizes that GAAP requires "nuanced" judgment calls and accounting estimates, which, if proven, might be a result of negligence, oversight, or mismanagement. *Magruder*, 2009 WL 854656, at *8. Even viewing the Amended Complaint in a light most favorable to the Plaintffs, these allegations do not show that Dubuque did not believe Guaranty's financial figures and statements at the time they were made. However, given the concerns that were brought to the attention of Dubuque and other executives, a point not disputed by Defendants, such allegations contribute at least partly to an inference of scienter.

    c)  *Dubuque admitted that it was "not a good time to sell" MBS.*

  Plaintiffs point to Dubuque's statements at a Guaranty investor conference call on February 6, 2008, at which he stated that it was "not a particularly good time to sell" MBS and that Guaranty could be "more transparent" with respect to its valuation of MBS portfolio, FAC ¶¶ 122, 129, as indications that Dubuque knew Guaranty was valuing its MBS improperly and violating GAAP. However, even viewing these statements in a light most favorable to Plaintiffs, these statements merely indicate a publicly known fact, that the MBS market was declining, and that Guaranty had not fully detailed the process by which it valued MBS. That "it wasn't a particularly good time to sell" would be more relevant if Plaintiffs were alleging that Guaranty was misstating the *market* value of its MBS, which it is not. As such, neither statement contributes to a strong inference of scienter.

    d)  *Dubuque resigned just as the truth about the bank was beginning to be disclosed.*

Dubuque resigned from his position as Guaranty's Chairman of the Board, President, and CEO on November 19, 2008, two weeks after Guaranty's November 5, 2008 press release, which reported a 2008 third quarter net loss of $162 million, disclosed that the carrying value of the MBS portfolio had decreased by another $600 million and disclosed that Guaranty had recorded a $53 million OTTI on non-agency MBS. FAC ¶¶ 168, 170, 176. The Court recognizes that the resignation of high level officials may contribute to an inference of scienter. *See generally In re Fleming Cos. Sec. & Derivative Litig.*, No. CIVA503MD1530TJW, MDL-1530, 2004 WL 5278716 (E.D. Tex. June 6, 2004). However, the Amended Complaint also alleges Guaranty's gradual decline, which included at least two prior significant stock drops in response to negative reports, suggesting that this overall decline, rather than securities fraud, was the impetus for Dubuque's resignation. Thus, this allegation, standing alone, does not contribute to a strong inference of scienter. *See Southland*, 365 F.3d at 383; *Abrams*, 292 F.3d at 434.

       e)        *Dubuque certified various SOX filings that were false and misleading.*

A signature on a SOX certification may raise an inference of scienter if the signer had reason to know or should have suspected the filings were false due to red flags linked to the accounting and reporting problems that arose and form the basis of the claims asserted. *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 552, 555 (5th Cir. 2007). However, here, Dubuque, who was CEO and is not alleged to be an accountant, signed off on the accounting opinions and judgments that were approved by Guaranty's top two internal accountants, Murff and Gifford, and Guaranty's outside auditors. Further, the purported red flags do not show that Dubuque should have suspected the filings were false. Accordingly, this allegation, standing alone, does not contribute to a strong inference of scienter.

41

Taking the Amended Complaint as a whole, along with its general allegations of motive, GAAP violations, and its allegations as to Dubuque specifically regarding Guaranty's capitalization levels, deficiencies in Guaranty's pricing models, his public statements, his resignation, and his SOX certifications, the Court finds that they do not raise a strong inference of scienter as to Dubuque. While the Amended Complaint may raise a plausible inference that Dubuque knew of the alleged fraud or was severely reckless, such inference is not at least as compelling as the competing inference, that he did not know of the alleged fraud or was merely negligent. As such, Dubuque's Motion to Dismiss, to the extent that it seeks dismissal of Plaintiffs' 10(b) and Rule 10b-5 claims against Dubuque based on failure to allege a strong inference of his scienter, is **GRANTED**. Count I is **DISMISSED WITHOUT PREJUDICE** as to Dubuque.

4.    Murff's Scienter

Defendant Murff served as Senior Executive Vice President and Chief Financial Officer ("CFO") of Guaranty and later assumed the duties and responsibilities of Guaranty's Principal Accounting Officer. Plaintiffs seek to hold Murff liable for alleged misrepresentations in Guaranty's 2007 10-K and three 10-Qs filed in 2008 as well as several Forms NT 10-K and Forms 8-K filed in 2009, all of which he signed. *See* Pls.' Resp. 17 n.14 (and citations therein).

a)    *Murff was aware of the Bank's dangerously low capitalization levels.*

As with the other Individual Defendants, Plaintiffs argue that Murff was aware of Guaranty's low levels of capital. The Court has already determined that such allegations provide support for Plaintiffs' theory regarding motive. However, such allegations, standing alone, do not support an inference of scienter as they do not lead to the conclusion that Guaranty was improperly valuing its MBS.

       b)     *Murff was aware of Guaranty's deficient pricing models and the overvaluation of the MBS portfolio.*

Plaintiffs point to essentially the same allegations as to Dubuque and Murff in support of their contention that Murff was aware of Guaranty's deficient pricing models. For the same reasons discussed above with respect to Dubuque, these allegations weigh somewhat in favor of scienter.

       c)     *Murff resigned from his position at Guaranty just as the truth about the Bank began to be disclosed.*

Murff resigned from his position as Guaranty's Senior Executive Vice President, CFO and Accounting Officer, less than a month before Guaranty filed for bankruptcy protection. FAC ¶ 185. The Court recognizes that the resignation of high level officials may contribute to an inference of scienter. However, the Amended Complaint also alleges Guaranty's gradual decline, which included at least three prior significant stock drops in response to negative reports, suggesting that this overall decline was the impetus for his resignation, rather than securities fraud. Thus, this allegation, standing alone, does not contribute to a strong inference of scienter as to Murff. *See Southland*, 365 F.3d 353, 383; *Abrams*, 292 F.3d 424, 434.

       d)     *Murff certified various SOX filings that were materially false and misleading.*

Here, Murff's position as one of Guaranty's top accountants, who was allegedly put on notice regarding certain deficiencies of Guaranty's MBS pricing methodology but still certified Guaranty's SOX filings, weighs somewhat in favor of scienter. In making this evaluation, the Court notes its prior discussions of whether Murff was put on notice via communications from confidential witnesses and ALCO meetings, and also notes that Guaranty's outside auditors signed off on Guaranty's statements and that Defendants continue to argue that they and Guaranty did not violate GAAP.

Taking the Amended Complaint as a whole, along with its general allegations of motive and GAAP violations as well as its allegations as to Murff specifically regarding Guaranty's capitalization levels, deficiencies in Guaranty's pricing models, his resignation, and his SOX certifications, the Court finds that they do not raise a strong inference of scienter as to Murff. While the Amended Complaint may raise a plausible inference that Murff knew of the alleged fraud or was severely reckless, such inference is not at least as compelling as the competing inference that he did not know of the alleged fraud or was merely negligent. As such, Murff's Motion to Dismiss, to the extent that it seeks dismissal of Plaintiffs' 10(b) and Rule 10b-5 claims against Murff based on failure to allege a strong inference of his scienter is **GRANTED**. Count I is **DISMISSED WITHOUT PREJUDICE** as to Murff.

### 5.      Gifford's Scienter

Plaintiffs' only allegations regarding Gifford's scienter focus on his position as Guaranty's Executive Vice President and Principal Accounting Officer, in which he signed Guaranty's 2007 10-K and two 10-Qs filed in 2008, and his resignation from Guaranty "just as the truth about the company began to be disclosed." *See* Pls.' Resp. 17 n.14 (and citations therein); FAC ¶ 167. They point to his role in upper level management with an accounting compliance focus and his Sarbanes-Oxley certifications, which acknowledged his responsibility to investors for establishing and maintaining effective controls to ensure that material information about Guaranty was brought to his attention. FAC ¶ 200. This is effectively a "he must have known" type of allegation that, standing alone, is insufficient to establish scienter under the PSLRA. Further, while the Amended Complaint sets forth descriptions of communications between confidential witnesses and senior management and meetings where the valuation of MBS and its proper accounting were discussed, there are no

allegations that Gifford specifically received any of these communications or was present at these meetings.

The Court also finds insufficient Plaintiffs' allegation that Gifford resigned from the Bank just as the truth about the company began to be disclosed. The Amended Complaint alleges that Gifford resigned on October 6, 2008, a month before Guaranty's November 5, 2008 press release, which reported a 2008 third quarter net loss of $162 million and disclosed that the carrying value of the MBS portfolio had decreased by another $600 million. The release also disclosed that Guaranty had recorded a $53 million OTTI on non-agency MBS. FAC ¶¶ 167, 168, 170. However, the Amended Complaint also alleges Guaranty's gradual decline, which included at least two prior significant stock drops in response to negative reports, suggesting that this gradual decline is the impetus for his resignation, rather than securities fraud. Thus, this allegation, standing alone, does not contribute to a strong inference of scienter.

Taking the Amended Complaint as a whole, along with its general allegations of motive and its allegations of Gifford's position in Guaranty, his SOX certifications, and his resignation, the Court finds that they do not raise a strong inference of scienter as to Gifford. While the Amended Complaint may raise a plausible inference that Gifford knew of the alleged fraud or was severely reckless, such inference is not at least as compelling as the competing inference, that he did not know of the alleged fraud or was merely negligent. Overall the Amended Complaint does not sufficiently allege that Gifford knew that Guaranty was making false or misleading statements or omissions or that he was at least severely reckless as to these statements. As such, Gifford's Motion to Dismiss, to the extent that it seeks dismissal of Plaintiffs' 10(b) and Rule 10b-5 claims against him based on

failure to allege Gifford's scienter is **GRANTED**. Count I is **DISMISSED WITHOUT PREJUDICE** as to Gifford.

    6.    <u>Temple-Inland's Scienter</u>[33]

Given that the Court finds that the Amended Complaint does not allege the scienter of any of the Individual Defendants under the PSLRA, the Court also finds that the complaint does not allege Temple-Inland's scienter. When determining whether a corporation's scienter can be drawn from an executive's false statements, it is "appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like)." *Southland*, 365 F.3d at 366 (citations omitted). Thus a corporation only has the requisite scienter if the individual executive making the statement had that level of scienter. *Id.* As discussed above, Plaintiffs fail to adequately allege a strong inference of scienter with regards to the Individual Defendants, and therefore there is no strong inference of scienter to impute onto Temple-Inland. Accordingly, the Court has additional grounds for dismissal of the claims against Temple-Inland and **DISMISSES WITHOUT PREJUDICE** Count I as to Defendant Temple-Inland for failure to adequately plead Temple-Inland's scienter.

E.    *Safe Harbor*[34]

---

[33]The Court has already dismissed all claims against Temple-Inland based on the Amended Complaint's failure to allege that Temple-Inland made any of the statements at issue but now looks to the Amended Complaint's allegations regarding Temple-Inland's scienter as possible additional grounds for dismissal.

[34]The Court has already dismissed Count I as to all Defendants but examines Defendants' safe harbor defense as potential additional grounds for dismissal.

The PSLRA provides a safe harbor for forward looking statements if "(A) the forward-looking statement is–(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial; or (B) the plaintiff fails to prove that the forward-looking statement . . . was made with actual knowledge . . . that the statement was false or misleading." 15 USC § 78u-5(c)(1); *see also Southland*, 365 F.3d at 371-72. Oral statements can qualify for safe harbor protection if they meet the above listed standard and are accompanied by an oral statement which identifies a document or portion of a document containing additional information which contains the appropriate cautionary language. *Southland*, 365 F.3d at 372; 15 U.S.C. § 78u-5(c)(2).

The Court notes the conflicting case law regarding whether a defendant's actual knowledge of the falsity of a forward-looking statements with meaningful cautionary language renders the safe harbor defense inapplicable. *See, e.g., Hopson v. MetroPCS Commc'ns, Inc.*, Civ. Action No. 3:09-cv-2392-G, 2011 WL 1119727, at *18 n.19 (N.D. Tex. Mar. 25, 2011) (and cases cited therein) (discussing conflict of *Lormand* and *Southland*). However, both the *Southland* and *Lormand* cases from the Fifth Circuit state that actual knowledge of the falsity of the statement will defeat the safe harbor defense. *See Southland*, 365 F.3d at 371 ("To avoid the safe harbor, plaintiffs must plead facts demonstrating that the statement was made with actual knowledge of its falsity."); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 244 (5th Cir. 2009) ("Because the plaintiff adequately alleges that the defendants actually knew that their statements were misleading at the time they were made, the safe harbor provision is inapplicable . . . ."). *But see Hopson*, 2011 WL 1119727, at *18 n.19 (finding that "[t]he statute's plain language makes clear that even if the plaintiff could prove that the defendants

made a forward-looking statement with actual knowledge of its falsity, the defendants would not be liable if the statement was immaterial or accompanied by meaningful cautionary language"). Accordingly, the Court finds that the safe harbor provision does not protect statements made with actual knowledge of their falsity.

Here, Murff, Gifford, and Dubuque argue that certain statements attributed to them are protected by the PSLRA's safe harbor provision, specifically "statements regarding the ability of the MBS pools to satisfy future debt obligations, the ability of subordinated tranches to absorb future losses in the loan pools in which the MBS participated, and many other forward-looking statements contained in the lengthy quotations that Plaintiff asserts were misleading," Murff Mot. 19 (citing FAC ¶¶ 119-175), and statements regarding Guaranty's intent to be more transparent in the future and intent and ability to hold its MBS to maturity. Dubuque Mot. 16 (citing FAC ¶¶ 122, 129, 138).[35] Murff, Gifford, and Dubuque also argue that some of these statements are too vague to be actionable. Plaintiffs respond that the purportedly forward-looking statements identified by these Defendants in fact deal with statements of current or historical fact which are not protected by the PSLRA's safe harbor and that the cautionary language contained within Guaranty's filings are merely boilerplate and insufficient to qualify the statements at issue for safe harbor. Pls.' Resp. 38-41 (citing *In re TETRA Techs., Inc. Sec. Litig.*, Civ. Action No. 4:08-cv-0965, 2009 WL 6325540, at *11, 32 (S.D. Tex. July 9, 2009); *In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767, 799-800 (S.D. Tex. 2012)).

_____

[35]Defendants do not claim that all of their statements are protected under the PSLRA's safe harbor provision. The Court assumes, for the purposes of examining whether the safe harbor applies, that each Individual Defendant "made" the statements attributed to them but notes that the Individual Defendants argue that Plaintiffs engaged in impermissible group pleading in attributing these statements to all Defendants.

The parties also dispute whether the Amended Complaint sufficiently alleges Defendants' actual knowledge of the falsity of the statements at issue.

The PSLRA's safe harbor provision lists several types of statements as those that would be considered forward looking such as "(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure or other financial items; (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer; [and] (C) a statement of future economic performance, including any statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission." 15 U.S.C. §§ 77z-2(i)(1). Here, statements regarding and related to Guaranty's ability to avoid future losses within its MBS portfolio and Guaranty's intent and ability to hold its MBS to maturity, *see* FAC ¶¶ 122, 138, 143-144, 158, 160, 170, are clearly the types of statements regarding income and losses, plans of management, and future economic performance contemplated by the PSLRA. Further, statements regarding Guaranty's intent to be more transparent in the future, *see* FAC ¶ 129, are "of the vague and optimistic type that cannot support a securities fraud action, and contain no concrete factual or material misrepresentation." *Lain v. Evans*, 123 F. Supp. 2d 344, 348 (N.D. Tex. 2000) (citation omitted) (finding non-actionable statements such as "we look forward to higher revenues and loan volume for the remainder of fiscal 1998" and that the company has "aggressive growth plans . . . to become a major player"). As such, these types of statements are forward-looking statements protected by the safe harbor of the PSLRA, provided that they were accompanied by meaningful cautionary language and were not made with actual knowledge of their falsity.

49

Plaintiffs argue that these statements are not protected by the safe harbor provision as they concern Guaranty's *present* intent to be more transparent in the future as to its valuation of the MBS portfolio and the *present* ability of the MBS pools to satisfy future debt obligations and of subordinated tranches to absorb future losses in the loan pools. Regardless of the characterization by Plaintiffs, such statements still concern future income or losses, plans of management, and future economic performance and are therefore forward-looking. *Cf. In re BP*, 852 F. Supp. 2d at 800 (statement listing corporate goal to complete company transition in two years was forward-looking, but statement regarding achievements towards implementation of that goal was not forward looking).[36]

The Court next looks to see whether the forward-looking statements at issue were accompanied by sufficient cautionary language. Guaranty's 2007 10-K and its 10-Qs for each quarter in 2008, Guaranty's conference calls with investors, and Guaranty's press releases were all accompanied by cautionary language identifying forward-looking statements. *See* Defs.' App. 26, 55-56, 70, 92, 111, 143-44, 154, 183. However, Plaintiffs claim this language is mere boilerplate insufficient to trigger the PLSRA's safe harbor provision, citing *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 245 (5th Cir. 2009). In *Lormand*, the Fifth Circuit compared certain cautionary language to other language found insufficient in *Plotkin v. IP Axess, Inc.*, 407 F.3d 690 (5th Cir. 2005), which merely stated that "[t]hese forward-looking statements involve numerous risks, uncertainties and assumptions, and actual results could differ materially from anticipated results." *Lormand*, 565 F.3d

---

[36] While statements regarding future income and losses, plans of management, and future economic performance made with actual knowledge of their falsity would not be protected by the safe harbor, actual knowledge of their falsity is not relevant to the issue of whether they are forward-looking.

at 245 (citing *Plotkin*, 407 F.3d at 694). The court explained that the disclaimer in *Lormand*, which was repeated with only minor changes throughout the statements at issue, was "similarly generic and formulaic, and likewise, is also boilerplate and not meaningful cautionary language." *Id.* As such, "in not one instance did this generic language amount to 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances specifically described in any of the alleged misrepresentation so as to constitute meaningful cautionary language." *Id.* (citation omitted).

In contrast to the disclaimers in *Lormand* and *Plotkin*, Guaranty's cautionary language is significantly more detailed and specifically identifies one of the main risks allegedly hidden by Defendants. The disclaimers do warn that Guaranty's actual results could differ from the projected results or goals, but they also go further in warning that Guaranty's financial results could suffer as a result of a decline in value of its MBS if the underlying loans defaulted at a higher than anticipated rate, eliminating the subordinate tranches. As one example, Guaranty's 2007 Form 10-K explains, after discussing various other risks:

> We have a significant investment in private issuer mortgage-backed securities. Deterioration in the value of single-family homes may cause borrowers to default on the mortgages underlying these securities. In the cash flow distribution from the underlying assets, our securities are senior to subordinate tranches. However, losses from the underlying loans could eliminate the subordinate tranches. In that case, our securities would begin to become impaired. If we were to conclude we would not fully recover all contractual amounts due on the securities, we would record charges to reduce the carrying amount of the securities, which would reduce our earnings and our regulatory capital.

Defs.' App. 52; *see also* Defs.' App. 51-56, 92, 99-100, 143-44, 152-53, 183-84, 189-90 (identifying various risks that could adversely affect Guaranty's performance); *cf. Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999) ("[W]hen an investor has been warned of risks of a significance similar

to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward . . . and satisfies [the company's] burden to warn under the statute . . . ."). While such cautionary statements do not warn against the exact behavior that Plaintiffs complain of, that Defendants were overvaluing their MBS portfolio and understating losses, the statements do warn of the root cause of such alleged overvaluation and understatement, namely that Guaranty's MBS, while senior tranche and thus less risky than subordinate MBS, could nevertheless be impaired if deterioration in the housing market caused too many borrowers to default on their mortgages.

Given that the Court finds that the statements identified by Murff, Gifford, and Dubuque are forward-looking and are accompanied by meaningful cautionary language, these statements are protected by the safe harbor provision of the PSLRA unless they were made with actual knowledge of their falsity. Given that the Court has already determined that the Amended Complaint does not allege a strong inference of each Defendants' scienter, Plaintiffs have not properly alleged that these statements were made with actual knowledge of their falsity and the safe harbor applies. Thus, the Court **GRANTS** Defendants' Motions to Dismiss as to Plaintiffs' claims to the extent the claims are based on the identified forward-looking statements. The Amended Complaint's claims based on the identified forward-looking statements are hereby **DISMISSED WITHOUT PREJUDICE**.

F.      *Loss Causation*[37]

---

[37]The Court has already dismissed Count I as to all Defendants but examines Defendants' loss causation argument as potential additional grounds for dismissal.

A plaintiff asserting securities fraud under Section 10(b) and Rule 10b-5 must allege that the defendants' alleged misrepresentations[38] proximately caused the economic loss suffered by the plaintiffs. *Lormand*, 565 F.3d at 255 (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)). Such pleading of "loss causation" is subject to the pleading standard of Federal Rule of Procedure 8(a)(2), rather than the heightened pleading requirement of Rule 9(b). *Lormand*, 565 F.3d at 256-58; *Magruder*, 2009 WL 854656, at *11 (citing *Dura*, 544 U.S. at 346) (other citations omitted). Under this standard, plaintiffs must allege "a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss, including allegations of a material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiff's economic loss." *Lormand*, 565 F.3d at 258 (citations omitted).

Further, loss causation "may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation." *Id.* at 261. These corrective disclosures need not directly reveal the fraud of previous statements; "it [is] enough that the market learned that the [prior] guidance was wrong and that other negative information unrelated to the reduced [and corrective] guidance did not cause the decline in [the corporation's] share price." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F3d 221, 231 (5th Cir. 2009) (citation omitted). While plaintiffs need not plead a fact-for-fact disclosure to establish loss causation, "loss caused solely by a general impression in the market that 'something is wrong' is insufficient to establish causation." *Id.* at 232 (citation omitted); *see also Ryan v. Flowserve*

---

[38]The Court assumes for the purposes of examining loss causation that the Amended Complaint sufficiently pleads actionable misrepresentations.

*Corp.*, 444 F. Supp. 2d 718, 729 (N.D. Tex. 2006) ("[N]either *Dura* nor any Fifth Circuit case requires the type of 'fact-for-fact' method of loss causation pleading urged by [the defendant].").

Further, "it is insufficient to simply allege that the misrepresentation 'touches upon' a later economic loss" as plaintiffs must allege "that the market reacted negatively to a corrective disclosure, which revealed the falsity of [the company's] previous representations." *Catogas v. Cyberonics, Inc.*, 292 F. App'x 311, 314 (5th Cir. 2008) (citations omitted).

Plaintiffs argue that during the Class Period, Defendants overstated the value of Guaranty's MBS portfolio and failed to timely record hundreds of millions of dollars of OTTI, thereby artificially inflating Guaranty's financial results. Plaintiffs identify three disclosures which they point to as corrective statements which gradually revealed the true value of the MBS portfolio and Guaranty's true financial condition:

- Guaranty's April 29, 2008 press release and 10-Q for the first quarter of 2008. The press release announced Guaranty's financial results for the first quarter of 2008, reporting a net loss of $10 million and a $600 million decrease in the carrying value of its MBS portfolio. The 10-Q, filed the same day, disclosed that the fair value of its non-agency MBS was $1.1 billion less than its amortized costs at March 31, 2008. Such disclosure purportedly caused the price of Guaranty stock to fall 19%, to $8.43. *See* FAC ¶¶ 137, 139-40, 147-48, 150.

- Guaranty's July 31, 2008 press release. The press release announced an $85 million net loss for the second quarter of 2008 and confirmed that the carrying value of the MBS portfolio had decreased an additional $300 million. The release also reported

54

that Guaranty's unrealized losses on MBS had increased to more than $1.4 billion.
Guaranty's stock price then fell 16%. *See* FAC ¶¶ 156, 159-161.

- Guaranty's November 5, 2008 press release, which reported a 2008 third quarter net
  loss of $162 million and disclosed that the carrying value of the MBS portfolio had
  decreased by another $600 million. The release also disclosed that Guaranty had
  recorded a $53 million OTTI on non-agency MBS. Guaranty's stock price then fell
  20%. *See* FAC ¶¶ 168, 170, 172.

Pls.' Resp. 59-61. In their motions to dismiss, Defendants assert that these disclosures are not
sufficient "corrective" disclosures to plead loss causation, given Plaintiffs' failure to allege that any
of the disclosures revealed that prior statements were false or fraudulent and given other intervening
events such as the general economic decline in the United States.[39]

Even viewing the Amended Complaint's allegations in a light most favorable to the Plaintiffs,
the Court agrees that Plaintiffs fail to plead that these statements are sufficient corrective statements
for the purposes of alleging loss causation. Here, the misstatements which purportedly overstate the
value of Guaranty's MBS portfolio and understate Guaranty's losses "touch upon" the purported
corrective statements given that they both concern the valuation of MBS and the disclosures explain
that Guaranty's losses were growing and its MBS portfolio was declining in value. However, the
corrective statements Plaintiffs identify do nothing to suggest that its prior statements were false.

---

[39]The Court notes that the parties' arguments regarding loss causation are in tension with their
arguments regarding the statute of limitations. Here, Plaintiffs argue that they could not have learned of
Defendants' fraud until the filing of the *Tepper* Complaint in 2011, despite having argued that the market
already responded to Guaranty's corrective statements in 2008 and 2009. At the same time, Defendants argue
that Plaintiffs should have learned of Defendants' purported fraud in early or mid-2009 because of these and
other purported corrective disclosures, despite having argued that nothing in the purported corrective
statements actually corrected the falsity of any prior statements.

They do not state or infer that Guaranty's previously reported valuations were incorrect or that Guaranty was engaged in improper accounting practices, nor do they bring to light Defendants' alleged securities fraud. *See Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 337 (5th Cir. 2010), *rev'd on other grounds*, 131 S. Ct. 2179 (plaintiffs "need to show more than that a subsequent disclosure reveals the defendant's true financial condition") (citation omitted); *see also Flowserve*, 572 F.3d at 230 (disclosure of company's weakening financial condition alone does not "relate" to earlier misstatements such that loss causation is established).[40] Simply put, as alleged by the Amended Complaint, these statements merely have a negative effect, rather than a corrective effect linked to any specific misrepresentations, and there are no allegations of "leaking out of relevant or related truth" about the purported fraud. *See Halliburton*, 597 F.3d at 338; *Lormand*, 565 F.3d at 258.

Plaintiffs also identify another purported corrective statement, Guaranty's March 17, 2009, Form NT 10-K, which disclosed that Guaranty was unable to timely file its Form 10-K for 2008 due to an ongoing "analysis and discussion" with its accountants concerning the appropriateness of the valuation of its MBS portfolio and the extent to which such portfolio had incurred an OTTI, after which Guaranty's stock dropped 28% (from $.64/share to $.46/share).[41] Pls.' Resp. 61 n.34 (citing

---

[40]While not required in order to plead loss causation, Guaranty never restated or revised the financials that were allegedly false and misleading, nor did it or a third party report that the company had been engaged in improper accounting or business practices, in contrast with many cases involving loss causation. *See, e.g., Flowserve*, 572 F.3d at 226 (company downwardly revised fiscal year guidance and downwardly restated earnings); *Fener v. Operating Eng'rs Constr. Indus. & Miscellaneous Pension Fund (Local 66)*, 579 F.3d 401, 405 (5th Cir. 2009) (newspaper company reported that internal investigation had revealed questionable circulation practices resulting in declining future expected declining circulation).

[41]Plaintiffs also identify purported corrective disclosures on March 31, 2009, May 14, 2009, and July 23, 2009, Pls.' Res. 61 n.34 (citing FAC ¶¶ 180, 183, 186), but do not allege how the market reacted to these particular disclosures. As such, the complaint does not properly allege that these statements were corrective

FAC ¶ 179). For the same reasons discussed above, these additional disclosures merely "touch upon" the falsity of the earlier misstatements. While these disclosures explain that Guaranty was in discussions regarding the proper valuation of its MBS portfolio and whether an OTTI occurred, nothing in these disclosures indicates that *prior* valuations were incorrect or that Guaranty should have recorded an OTTI in *prior* SEC filings, nor do they "bring to light any of the alleged fraud by defendants." *See Catogas*, 292 F. App'x at 315-16. As such, this disclosure "does not correct and reveal the truth of the previously misleading statement" and is therefore insufficient to allege loss causation. *See Halliburton*, 597 F.3d at 336. Given that the Amended Complaint does not properly allege loss causation, Defendants' Motions, to the extent that they seek dismissal of the Amended Complaint's Section 10(b) and Rule 10b-5 claims, are hereby **GRANTED**. Count I of the Amended Complaint is hereby **DISMISSED WITHOUT PREJUDICE** as to all Defendants.[42]

G.     *Statute of Limitations*[43]

The limitations period for a Section 10(b) private securities fraud action is two years after the discovery of the facts constituting the violation. 28 U.S.C. § 1658(b)(i); *see also Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1798 (2010). This limitations period "begins to run once the plaintiff did

---

disclosures for the purposes of establishing loss causation.

[42]Given that the Court has already determined that the purported corrective statements are not corrective, it does not examine whether other intervening events may have caused the stock price decline but it also notes that on a motion to dismiss, the Court may not weigh a plausible inference of loss causation against competing inferences. *Lormand*, 565 F.3d at 267 (citations omitted). *But see Dura*, 544 U.S. at 342-43 (loss must be caused because truth made "its way into the marketplace," not as a result of "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions," or other factors independent of the fraud).

[43]The Court has already dismissed Count I as to all Defendants but examines Defendants' limitations defense as potential additional grounds for dismissal.

discover or a reasonably diligent plaintiff would have discovered the facts constituting the violation – whichever comes first." *Merck*, 130 S. Ct. at 1798 (citation omitted). Although not binding on this Court, another court explained that a fact is deemed "discovered" when "a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint." *See City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011).

In assessing the Defendants' limitations defense, the Court's review is limited to the allegations in the complaint and to those documents attached to a defendant's motion to dismiss to the extent that those documents are referred to in the complaint and are central to the claims. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). Nevertheless, dismissal under Federal Rule of Civil Procedure 12(b)(6) is warranted where an affirmative defense, such as the statute of limitations, is apparent on the face of the plaintiff's complaint. *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir.2003) (citations omitted).

Although the alleged misstatements at issue in the Amended Complaint were made more than two years prior to the filing of the original complaint in this case, Plaintiffs argue that they could not have learned of the extent of Defendants' intentional conduct until the *Tepper* Complaint was filed in August 2011.[44] FAC ¶ 214; *see also* Pls.' Resp. 69 (arguing that Plaintiffs could not and did not discover the facts of the securities fraud until the *Tepper* Complaint "detailed the fraudulent

---

[44]The parties spend a considerable amount of briefing arguing about whether the *Tepper* Complaint provided the "facts constituting the violation" or at least triggered an investigation by Plaintiffs which provided such facts. While such discussion may help point to a "no-later-than" date when Plaintiffs had or should have had knowledge of their claims, such discussion is less helpful in determining whether Plaintiffs had or should have had knowledge of the facts constituting their claims two years prior to the filing of their original complaint in this case. As such, the Court expresses no opinion as to whether the *Tepper* Complaint put Plaintiffs on notice as to Defendants' alleged securities fraud. Also, for the same reason, the Court does not find the omission of Defendants Murff and Gifford from the *Tepper* Complaint dispositive in determining when the statute of limitations may have run with respect to Murff and Gifford.

scheme carried out by Temple-Inland and certain individual defendants, whereby Temple-Inland caused Guaranty's demise by exploiting Guaranty's financial resources").

Defendants counter that Plaintiffs should have discovered the alleged scheme much earlier and should have begun investigating as early as March 17, 2009 or no later than July 2009. Specifically, Defendants point to events from March to July 2009 that they claim should have alerted Plaintiffs to the facts constituting the alleged securities fraud in this case. These events include (1) Guaranty's SEC filing on March 17, 2009, when Guaranty disclosed an "ongoing 'analysis and discussion' with its accountants concerning the appropriateness of the valuation of its MBS portfolio,'" *see* FAC ¶ 179; (2) Guaranty's SEC filing on April 8, 2009, when Guaranty announced that it had consented to the issuance of a Cease and Desist Order by the OTS, *see* FAC ¶ 182; (3) Guaranty's announcement on June 29, 2009 that "the preliminary financial information it provided for the periods ended December 31, 2008 and March 31, 2009 should not be relied upon," *see* FAC ¶ 184; (4) the announcement of Guaranty's $1.45 billion OTTI restatement on July 23, 2009, taken at the direction of the OTS,[45] *see* FAC ¶¶ 186; (5) Guaranty's SEC filing on August 24, 2009 disclosing that the OTS had closed the Bank and appointed the FDIC as a receiver and the New York Stock Exchange had suspended trading on Guaranty stock, *see* FAC ¶ 189; and (6) Guaranty's August 27, 2009 Chapter 11 bankruptcy filing, *see* FAC ¶ 190, all of which occurred more than two years prior to the filing of Plaintiffs' original complaint in this case. Dubuque Mot. Dismiss 31-32; Temple-Inland Mot. Dismiss 23-25; Murff Mot. Dismiss 33-34.

---

[45]This filing also stated that Guaranty did not believe that it would be able to continue as a going concern and stated that a receiver or conservator would likely be appointed. FAC ¶ 186.

After reviewing the Amended Complaint as well as the briefing on Defendants' Motions to Dismiss, the Court determines that the issue of whether the statute of limitations has run on Plaintiffs' claims is a factual dispute not appropriate for resolution at this time on Defendants' motions to dismiss. In doing so, the Court notes that the *Merck* court rejected an "inquiry notice" interpretation of 28 U.S.C. § 1658(b)(i), explaining that "the point where the facts would lead a reasonably diligent plaintiff to investigate further . . . is not necessarily the point at which the plaintiff would already have discovered facts showing scienter or other 'facts constituting the violation.'" 130 S.Ct at 1797. Thus, even assuming that any of the events cited by Defendants put Plaintiffs on inquiry notice, which would then spur or should have spurred the Plaintiffs to investigate further, such assumption does not allow the Court to determine, based on the pleadings and the related attachments, when exactly Plaintiffs should have discovered the facts constituting the violation. Simply put, the Court cannot say that as a matter of law, the Plaintiffs did discover, or a reasonably diligent plaintiff would have discovered, the facts constituting the alleged securities fraud, especially the facts constituting scienter, more than two years prior to the filing of this complaint, or by November 11, 2009. Accordingly, Defendants' Motions to Dismiss, to the extent they seek dismissal of this case based on limitations, are **DENIED**.

H.     *Control Person Liability*

Plaintiffs seek to establish secondary liability on the Individual Defendants through Section 20 of the Exchange Act. FAC ¶¶ 215-217. Section 20(a) of the Exchange Act imposes joint and several liability on "[e]very person who, directly or indirectly, controls[46] any person liable under any

---

[46]"Control" under Section 20 of the Exchange Act is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through

provision of this chapter or of any rule or regulation thereunder" for securities fraud. 15 U.S.C. § 78t(a). To state a control person claim under Section 20, Plaintiffs must allege a primary securities violation by someone under the "controlling person." *See Southland*, 365 F.3d at 383 ("Control person liability is secondary only and cannot exist in the absence of a primary violation.") (citation omitted). Plaintiffs must also allege that the controlling person has "actual power or influence over the controlled person."[47] *Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 620 (5th Cir. 1993) (citation omitted). Because this Court finds that the Amended Complaint does not allege that anyone had the required scienter to be liable under the Exchange Act and because it does not properly allege loss causation, there is no basis of liability for the Individual Defendants. Accordingly, the Court **GRANTS** the Individual Defendants' Motions to Dismiss to the extent they seek dismissal of Plaintiffs' Control Person claims based on failure to allege a primary violation of the Exchange Act. Count II is hereby **DISMISSED WITHOUT PREJUDICE** as to the Individual Defendants.[48]

Defendants also seek dismissal of the Amended Complaint's control person claims based on their argument that Plaintiffs fail to allege "actual power or influence over the controlled person," as required by *Abbott*.[49] The Amended Complaint alleges that "[b]y reason of their position as officers and/or directors of Temple Inland and Guaranty, and their ownership of Guaranty common stock, the Individual Defendants had the power and authority to cause Guaranty to engage in the wrongful

---

the ownership of voting securities, by contract, or otherwise." 17 CFR § 230.405.

[47]Defendants have not produced, and the Court has not found, any authorities stating that Section 20 claims are subject to the heightened pleading requirements of the PSLRA or Rule 9(b).

[48]The Amended Complaint does not assert a control person liability claim against Temple-Inland.

[49]The Court examines the Individual Defendants' other arguments regarding control person liability as potential additional grounds for dismissal of Count II.

conduct complained of herein." FAC ¶ 217. The Court agrees with Defendants that Plaintiffs may not simply rely on the Individual Defendants' positions with Guaranty in asserting control person liability. *See, e.g., Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509-10 (5th Cir. 1990) (defendant's status as director "alone will not automatically cause him to be deemed" a control person under Section 20, as "[h]e must be found to have influence over at least the direction of the firm" (citation omitted)). However, the Amended Complaint has alleged, at a minimum, that the Individual Defendants have influence over at least the direction of the firm, given their status as members on boards or committees that set policy for the firm and their signatures and certifications within SEC filings. *See* Pls.' Resp. 71-73 (and citations therein). In so finding, the Court notes that the Fifth Circuit has rejected the contention that actual participation in the underlying transaction constituting the violation was a prerequisite for a *prima facie* case, as "lack of participation and good faith constitute an affirmative defense." *See Abbott*, 2 F.3d at 619-20 (citation omitted).[50]

In light of the foregoing, the Court **DENIES** the Individual Defendants' Motions to Dismiss to the extent they seek dismissal of the Amended Complaint's control person claims based on failure to allege actual power or influence over the controlled person.

## IV.

## CONCLUSION

For foregoing reasons, the Court finds that Plaintiffs' Amended Consolidated Class Action Complaint does not state a claim for violations of Section 10(b) and Rule 10b-5 or Section 20(a).

---

[50]Further, although courts reviewing Section 20 liability frequently discuss the level of a director's day-to-day involvement in a company, the Fifth Circuit has not decided that day-to-day involvement is required. *See, e.g., Abbott*, 2 F.3d at 619 (noting that Fifth Circuit case law is "ambiguous on whether 'effective day-to-day control' is required" (quoting *G.A. Thompson*, 636 F.2d at 958 n.24)).

As such, Defendants' Motions to Dismiss Counts I and II are hereby **GRANTED**. The Amended Complaint is hereby **DISMISSED WITHOUT PREJUDICE**.

The Court does not take lightly dismissal of a claim without reaching its merits. Thus, a plaintiff will be given the opportunity to amend a complaint where it appears that more careful or detailed drafting might overcome the deficiencies on which dismissal is based. *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000) (noting that a court may dismiss a claim for failing to comply with Rule 9(b), but "it should not do so without granting leave to amend, unless the defect is simply incurable or the plaintiff has failed to plead particularity after being afforded repeated opportunities to do so"); *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (observing that a complaint should only be dismissed under Rule 12(b)(6) "after affording every opportunity for the plaintiff to state a claim upon which relief can be granted" (citation omitted)).

If Plaintiffs are able to replead any Counts to overcome all of the grounds stated herein for dismissal as to the Individual Defendants, they should do so by no later than thirty (30) days from the date of this Order. Further, any repleading shall be accompanied by a synopsis of no more than ten (10) pages, explaining how the amendments overcome the grounds stated for dismissal in this Order. Should Plaintiffs replead, Defendants are hereby granted leave to file responses to Plaintiffs' synopsis. Any response shall not exceed ten (10) pages and must be filed within fourteen (14) calendar days of the repleading. No further briefing will be permitted. Should Plaintiffs wish to replead as to Temple-Inland specifically, they must file a motion for leave to amend in accordance with the Local Rules and the Federal Rules of Civil Procedure.

SO ORDERED.

SIGNED: March 28, 2013.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE