UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NORTH PORT FIREFIGHTERS' PENSION – LOCAL OPTION PLAN, Individually and on behalf of all others similarly situated, | § § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:11-CV-3119-B |
| TEMPLE-INLAND, INC., KENNETH M. JASTROW II, KENNETH R. DUBUQUE, RONALD D. MURFF, and CRAIG E. GIFFORD, | § § § § § § | |
| Defendants. | § | |

### MEMORANDUM OPINION AND ORDER

Before the Court is the Second Amended Class Action Complaint ("Second Amended Complaint" or "SAC") filed April 26, 2013. For the reasons discussed below, the Second Amended Complaint does not correct the deficiencies of the Amended Class Action Complaint ("First Amended Complaint" or "FAC") filed April 19, 2012, as discussed in this Court's Memorandum Opinion dated March 28, 2013. Due to failure to adequately plead a strong inference of scienter, Plaintiffs' claims are **DISMISSED WITH PREJUDICE**.

### I.

### BACKGROUND[1]

This action is a private securities fraud putative class action on behalf of all purchasers of

---

[1] The Court largely repeats its prior discussion of the general allegations this case contained in its March 28, 2013 opinion, referring instead, however, to the allegations of the Second Amended Complaint.

1

Guaranty Financial Group, Inc. ("GFG" or "Guaranty") common stock between December 12, 2007 and August 24, 2009 (the "Class Period") against Defendants Temple-Inland, Inc. ("Temple-Inland") and Guaranty officers and directors Kenneth M. Jastrow II ("Jastrow"), Kenneth R. Dubuque ("Dubuque"), Ronald D. Murff ("Murff"), and Craig E. Gifford ("Gifford") (collectively "Defendants") for violations of the Securities and Exchange Act of 1934 (the "Exchange Act"). SAC ¶¶ 1, 9-12. Guaranty Financial Group was a bank-holding company that owned all the stock of Guaranty Bank (the "Bank"). *Id.* at ¶ 8. For simplicity, the Court will refer to both GFG and the Bank as "Guaranty."[2]

During December 2007, Guaranty was spun off from Temple-Inland and common shares of Guaranty were distributed to Temple-Inland shareholders (the "Spin-Off"). *Id.* at ¶ 8. Plaintiffs allege that prior to the Spin-Off, Temple-Inland used the Bank to support, create demand, and generate profits for its core building products business, rather than operating it as a traditional bank. *Id.* This alleged conduct led at least in part to Guaranty's eventual bankruptcy filing and a suit filed on August 22, 2011 by Kenneth L. Tepper, the Liquidation Trustee for GFGI Liquidation Trust and Assignee of the Federal Deposit Insurance Corporation ("FDIC"), *Tepper v. Temple-Inland, Inc.*, No. 3:11-cv-2088 (N.D. Tex.) (the "*Tepper* Complaint"). *See id.* at ¶¶ 8, 21-22.

The *Tepper* Complaint asserted numerous claims involving fraudulent and preferential transfers and breach of fiduciary duty against Temple-Inland, TIN, Inc., Forestar (USA) Real Estate Group Inc., Jastrow, Randall D. Levy, Arthur Temple III, and Larry E. Temple. These claims were eventually settled for $80 million, with $38 million paid to Mr. Tepper as Liquidation Trustee and

---

[2] As addressed above, the Bank and GFG filed for bankruptcy protection and are not parties to this suit.

2

$42 million to the FDIC, with no admission of liability by the defendants in that case.[3] *See* Order Approving Compromise and Settlement Agreement Ex. A, filed Nov. 19, 2012, *In re Guaranty Fin. Grp. Inc.*, Case 09-35582-bjh11 (Bankr. N.D. Tex.). *See also* SAC ¶¶ 21-23.

Shortly after the *Tepper* Complaint was filed, Plaintiffs filed the instant case against Defendants Temple-Inland, Jastrow, Dubuque, Murff, and Gifford alleging securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.[4] *See generally* FAC.

---

[3] The Court expresses no opinion as to any allegations of malfeasance not connected to the alleged securities fraud in this case.

[4] Section 10(b) states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Section 20(a) states:

Every person who, directly or indirectly, controls any person liable under any provision of

While the *Tepper* Complaint centered on claims of improper transfers and breach of fiduciary duty, Plaintiffs' claims in this case are based exclusively on Plaintiffs' allegations that the Defendants violated federal securities laws. More precisely, Plaintiffs allege that during the Class Period, Guaranty issued materially false and misleading financial statements which overstated the fair value of its mortgage-backed securities ("MBS") portfolio and understated unrealized losses of that portfolio. SAC ¶ 46. As part of this alleged fraudulent scheme, Guaranty "engaged in improper financial practices that violated GAAP[5] and that were designed to, and did, artificially inflate the Bank's regulatory capital, thereby masking its solvency risk and the risk associated with the Bank's ability to continue as a going concern."[6] *Id*. at ¶ 45. Specifically, Plaintiffs allege that the Individual Defendants' "financial-related statements about Guaranty" were materially false and misleading and caused the Bank to issue financial statements that violated GAAP and SEC rules and regulations because:

> (a) the fair value of the Bank's non-agency MBS portfolio were materially overstated,

---

> this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

[5]As alleged by the Second Amended Complaint, "GAAP" refers to Generally Accepted Accounting Principles and "consists of those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time." *Id.* at ¶ 44 n.2.

[6]Plaintiffs allege that "[a]s a savings and loan company, the Bank was subject to regulations established by the [Office of Thrift Supervision, or "OTS"] and the FDIC, including those associated with the maintenance of certain capital requirements." SAC ¶ 44. The term "capital requirements" refers to the amount of capital a lending institution is required to maintain. Federal statutes and regulations use ratios comparing the amount of capital to certain assets in order to measure the capital adequacy of a lending institution. *Id.*

>   which, in turn, materially understated the unrealized losses on the Bank's non-agency MBS portfolio;
>   (b) the Bank improperly failed to timely record an "other than temporary impairment" ("OTTI") in the value of the Company's non-agency MBS portfolio; and
>   (c) the Bank improperly failed to disclose material events about the diminution in the value of the non-agency MBS portfolio occurring subsequent to December 31, 2007 and prior to the filing of the 2007 Form 10-K.

SAC ¶ 46. Plaintiffs allege that this overstatement of fair values and understatement of losses was a result of Guaranty's use of improper pricing models to value its MBS portfolio. *Id.* at ¶¶ 56-57. Plaintiffs repeat similar allegations with respect to other Guaranty SEC filings and statements. *See, e.g., id.* at ¶¶ 108-122 (discussing February 6, 2008 press release and conference call).

Despite repeated assurances regarding the safety of its MBS portfolio, Guaranty's financial situation continued to deteriorate throughout the Class Period. This deterioration eventually resulted in the Office of Thrift Supervision ("OTS") instructing Guaranty to record a $1.62 billion OTTI on its MBS portfolio. SAC ¶ 73. Unable to maintain the OTS' required capital ratios or procure additional capital, Guaranty was eventually closed by the OTS and the FDIC was appointed as a receiver, with the company filing for bankruptcy protection under Chapter 11 shortly thereafter.[7] SAC ¶¶ 200, 202, 209, 212, 216-218.

Defendants filed four Motions to Dismiss in response to the filing of the First Amended Complaint. The Court granted the motions in a 64-page opinion issued on March 28, 2013 and dismissed without prejudice all claims of the First Amended Complaint. In doing so, the Court ordered that:

>   Plaintiffs' claims against Temple-Inland are **DISMISSED WITHOUT PREJUDICE**

---

[7]Guaranty is not named as a defendant in this case as a result of the bankruptcy filings of Guaranty and its wholly-owned subsidiaries. SAC ¶ 8.

for failing to plead facts supporting their claims with particularity, for engaging in impermissible group and puzzle pleading, for failing to allege that Temple-Inland "made" any of the alleged misstatements in the Amended Complaint, failing to allege Temple-Inland's scienter, and for failure to allege loss causation. Plaintiffs' claims against Jastrow, Dubuque, Murff, and Gifford ("the Individual Defendants") are hereby **DISMISSED WITHOUT PREJUDICE** for failing to plead facts supporting their claims with particularity, for engaging in impermissible group and puzzle pleading in their allegations against the Individual Defendants, and for failure to adequately allege the Individual Defendants' scienter, loss causation, and control person liability.[8]

Mem. Op. Mar. 28, 2013 at 1-2. However, the Court granted leave to replead within thirty days, with instructions to accompany any repleading with a synopsis "explaining how the amendments overcome the grounds stated for dismissal in this Order." Defendants were also granted leave to file responses to Plaintiffs' synopsis. Having received Plaintiffs' Synopsis (doc. 69) as well as the responses of Jastrow (doc. 70), Murff and Gifford (doc. 71), and Dubuque (doc. 72), the repleading is now ripe for the Court's examination.[9]

## II.

## LEGAL STANDARD

In analyzing a complaint under Federal Rule of Civil Procedure 12(b)(6), the Court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004). The complaint should be dismissed only if it does not include enough facts to state a claim to relief that is plausible on its face.

---

[8]The Court denied the Motions to Dismiss to the extent Defendants sought dismissal of all claims based on other arguments contained in the Motions to Dismiss and granted in part and denied in part the Motions with respect to certain partial defenses.

[9]Plaintiffs did not replead their claims against Defendant Temple-Inland nor did they seek leave to amend their complaint with respect to the claims against Temple-Inland. As such, all claims against Temple-Inland are hereby **DISMISSED WITH PREJUDICE**.

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim must be "nudged . . . across the line from conceivable to plausible." *Id*. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *SW Bell Tel., LP v. City of Hous.*, 529 F.3d 257, 260 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555).

Special pleading rules apply to fraud claims. Pursuant to Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"), all allegations of fraud must be stated with particularity. Under Fifth Circuit precedent, pleading fraud with particularity sufficient to satisfy Rule 9(b) requires the pleader to identify the "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (internal citation omitted). Stated differently, Rule 9(b) requires "the who, what, when, where, and how" of the alleged fraud to be laid out in the complaint. *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003).

Securities fraud claims brought by private litigants are also subject to the pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Section 78u-4(b) of the PSLRA requires a plaintiff pleading a false or misleading statement or omission under federal securities law to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). At a minimum, the PSLRA pleading standard incorporates that of Rule 9(b). *ABC Arbitrage Pls. Grp. v. Tchuruk*, 291 F.3d 336, 349-50 (5th Cir.

2002); *see also Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362-63 (5th Cir. 2004).

In order to plead fraud with specificity as required by the PSLRA, the complaint must also "distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud." *Southland*, 365 F.3d at 365 (emphasis in original). Allegations against "Defendants" as a group are not imputable to any particular individual "unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded." *Id.* Thus, allegations that each defendant controlled the contents of and participated in writing a company's SEC filings, reports, and releases, without more, are insufficient to meet the requirements of the PLSRA. *Id.* Similarly, complaints must not engage in "puzzle pleading" by "isolating allegations and elements while leaving it to the [c]ourt to infer a connection," as "it is the parties' burden to present succinct pleadings which clearly lay out" the required elements – a court is not required to "waste its resources attempting to construe which statements are actionable and why each is actionable." *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 857-58 (N.D. Tex. 2005).

The PSLRA also requires that the plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," frequently referred to as the defendant's scienter. 15 U.S.C. § 78u-4(b)(2); *Southland*, 365 F.3d at 363. Scienter under the PSLRA means an "intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers . . . is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* at 366 (citation omitted). Severe recklessness "is 'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that

present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir. 2002) (citation omitted).

The facts as alleged by plaintiffs must give rise to a "strong inference" of scienter, which "must be more than merely plausible or reasonable–it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). In evaluating scienter, a court "must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Id.* at 314. Further, "the allegations should not be read in isolation, but taken together as a whole to see if they raise the necessary strong inference of scienter," considering "whether all facts and circumstances 'taken together' are sufficient to support the necessary strong inference of scienter on the part of the plaintiffs." *Abrams*, 292 F.3d at 431 (citation omitted). "Properly pleaded circumstantial evidence will suffice to withstand dismissal if the circumstantial evidence justifies a strong inference of scienter," but a court "will not strain to find inferences favorable to the plaintiffs" when determining whether scienter allegations have been sufficiently pleaded. *In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832, 843 (N.D. Tex. 2005) (citing *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 424-25 (5th Cir. 2001) and *Goldstein v. MCI WorldCom*, 340 F.3d 238, 244 (5th Cir. 2003)).

### III.

### ANALYSIS

A.   *Changes Made in Second Amended Complaint*

Plaintiffs highlight in their Synopsis both allegations previously made in the First Amended

Complaint and repeated in the Second Amended Complaint and new allegations that they argue cure the deficiencies of the First Amended Complaint. Plaintiffs first discuss allegations that a confidential witness repeatedly apprised defendants Dubuque and Murff of deficiencies in the pricing models used to value Guaranty's MBS portfolio. Plaintiffs also highlight Guaranty's "admission of a motive for concealing its true financial results – its desperate need for capital" and allegations of additional financial information "that more fully conveys" the magnitude of overstatement in fair value of Guaranty's MBS portfolio and understatement in Guaranty's pre-tax losses.[10] Finally, Plaintiffs explain that the Second Amended Complaint "draws together . . . a description of nine separate factors . . . that together satisfy" the PSLRA's scienter requirement.[11] Synopsis 2-3.

The Court recognizes these and other changes Plaintiffs made to the operative pleading by filing the Second Amended Complaint. In the Court's view, however, these changes do not change the Court's analysis regarding scienter in its March 28, 2013 Memorandum Opinion, for the reasons that follow.

B.  *Red Flags*

Plaintiffs' Synopsis first argues that the Second Amended Complaint sufficiently alleges scienter based on its evidence "*previously alleged* in the [First Amended Complaint], that the

---

[10]Aside from these changes regarding scienter, the Second Amended Complaint also largely drops the allegations that the Defendants knowingly mischaracterized their MBS as senior tranche or triple AAA rated, now stating that such characterizations, while "technically accurate," were materially false and misleading when made in that they failed to disclose the flawed asset pricing models used to value the MBS portfolio and the known inflated value of the MBS portfolio. *See, e.g.* SAC ¶ 109.

[11]The Synopsis also discusses changes to the pleading which purportedly cure the deficiencies the Court found with respect to group and puzzle pleading, loss causation, and false financial figures. The Court expresses no opinion as to whether the Second Amended Complaint cures these or any other deficiencies identified in its March 28, 2013 opinion.

Individual Defendants understood, or were culpably reckless in not understanding, the severity of Guaranty's capital situation, the gross inflation of the non-agency MBS portfolio, and the resulting gross understatement of Guaranty's pre-tax losses." Synopsis 2 (citing SAC ¶¶ 38-95) (emphasis added). Plaintiffs point to, as one example, allegations that a confidential witness[12] "repeatedly apprised" defendants Dubuque and Murff of deficiencies in the pricing models used to value Guaranty's MBS portfolio, including a January 2007 email, as well as meetings of Guaranty's Asset Liability Committee attended by Dubuque and Murff in which this information was conveyed. *Id.* These allegations are essentially identical to the allegations of the First Amended Complaint. *Compare*, *e.g.*, SAC ¶¶ 58-65 *with* FAC ¶¶ 63-73. The allegation that CW5 was personally in ALCO meetings attended by Dubuque and Murff in which potential MBS write downs were discussed is also contained in both the First and Second Amended Complaints. *Compare* SAC ¶ 93 *with* FAC ¶ 96. Finally, the red flags identified in the Second Amended Complaint are essentially identical to those listed in the First Amended Complaint. *Compare* SAC ¶¶ 77-78, 85-86, 87-88, 92-93 *with* FAC ¶¶ 88-97. Given that the allegations in the Second Amended Complaint largely repeat the same evidence showing that the Individual Defendants knew that Guaranty was making false or misleading statements in connection with Guaranty's MBS portfolio, or were severely reckless, these allegations do not change the Court's analysis regarding scienter.

---

[12]The Court notes that the Second Amended Complaint now discusses allegations regarding six Confidential Witnesses, in contrast with the five Confidential Witnesses discussed in the First Amended Complaint. The allegations regarding "CW6" state that he or she noted that "early in the Class Period, the Bank's management held 'discussions' about the 'sheer volume of delinquencies on mortgages' in April 2008 and how the rising number of delinquencies were adversely impacting the MBS portfolio at the time." SAC ¶ 82. This allegation matches the First Amended Complaint's allegations regarding "CW3": "A former Director of Financial Reporting at the Bank during the Class Period, CW3, noted that, early in the Class Period the Bank's management held 'discussions' about the 'sheer volume of delinquencies on mortgages' and how the rising number of delinquencies were impacting the MBS portfolio at the time." *See* FAC ¶ 91.

C.    *Motive*

The Second Amended Complaint does not allege any new evidence that changes the Court's analysis regarding the Individual Defendants' motive. Plaintiffs argue that the Second Amended Complaint "now specifically alleges Guaranty's admission of a motive for concealing its true financial results – its desperate need for capital." Synopsis 2-3 (citing SAC ¶¶ 209, 212, 213). However, the Court already found that the Amended Complaint properly pled the Defendants' motive,[13] though viewing the allegations of the complaint as a whole, they did not properly allege a strong inference of scienter as required by the PSLRA. Mem. Op. 34. The "new" allegations Plaintiffs highlight now do not change the Court's conclusion as to the Defendants' scienter. The fact that Guaranty stated on July 23, 2009 that its write downs foreclosed the possibility of applying for open bank assistance was already alleged in the First Amended Complaint. *See* FAC ¶ 186. Further, such "admission" does not necessarily show that the Individual Defendants knew the purported misstatements were false or misleading, or were severely reckless, when the statements were made. Thus, the allegations regarding motive contribute to an inference of scienter but do not, standing alone, raise a strong inference of scienter.

D.    *Magnitude of the Overstatement and Understatement*

The Court also does not find that the "additional financial information that more fully conveys the magnitude of the overstatement in fair value of the non-agency MBS portfolio and

---

[13]The Court explained that "Guaranty's survival as a going concern was at stake apparently from the date of the Spin-Off," and thus Plaintiffs had alleged "more than the general desire to improve financial results." Mem. Op. 34. The Court also explained, however that "the problem of declining value of MBS was widespread during the Class Period, to the extent that the future of the entire financial sector was seemingly at stake and this motive would be common to virtually every holder of significant amounts of mortgage-backed securities." *Id.*

understatement in Guaranty's pre-tax losses" alone establishes a strong inference of the Defendants' scienter. *See* Synopsis 3. The Court previously explained that the magnitude of a GAAP violation can contribute to an inference of scienter, and the Court also found that the Amended Complaint's allegations regarding GAAP violations contributed to an inference of scienter but did not alone contribute to a strong inference. Mem. Op. 33.[14] The fact that the Second Amended Complaint may be more specific regarding the GAAP violations does not change this analysis, given that the magnitude of the alleged violations, as alleged in the Second Amended Complaint, is similarly large. Now, looking at the allegations of the Second Amended Complaint as a whole, the Court finds that the allegations regarding the GAAP violations contribute to an inference of scienter but standing alone do not allege a strong inference of scienter.

E.  *Summary of Factors*

The Second Amended Complaint adds a new section of allegations purportedly "drawing together" all of the factors which, considered in their totality, sufficiently plead a strong inference of the Individual Defendants' scienter. Specifically, Plaintiffs argue that

> Collectively, the magnitude and duration of Guaranty's improper accounting, coupled with the Individual Defendants' willful blindness to the numerous deficiencies in the Bank's MBS pricing model, which were repeatedly brought to their attention during the Class Period, and the Individual Defendants' rejection of GAAP's requirements for recording an OTTI and the OTS' appeal to record an OTTI in the non-agency

---

[14]The Court explained that "[e]ven if Guaranty had restated its financials and violated GAAP . . . these types of errors can 'easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action.'" Mem. Op. 33 (citing *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 433 (5th Cir. 2002)). The Court further explained that "the failure to record an OTTI . . . would have a large effect on Guaranty's bottom line," and the July 2009 OTTI restatement "resulted in Guaranty 'having negative capital' and seemed to the be 'last straw' in Guaranty's long and gradual decline." The Court concluded that "[g]iven that the issue of whether Guaranty violated GAAP is disputed but the alleged magnitude and extent of the violations is large," the magnitude of the alleged GAAP violations contributed to an inference of scienter but alone did not raise a strong inference of scienter. *Id.*

> MBS portfolio during the quarter ended June 30, 2008, together demonstrate a strong inference that each of the Individual Defendants acted with scienter and engaged in fraudulent Class Period financial reporting. That is especially true given the Bank's critical need for significant amounts of additional capital during the Class Period, and Guaranty's acknowledgment that its eventual recording of an OTTI foreclosed the possibility for open bank assistance, and that its ability to continue as a going concern was no longer probable.

Synopsis 3 (citing SAC ¶¶ 92, 220). While perhaps a useful summary of Plaintiffs' allegations, the allegations asserted in the new section were previously raised in the First Amended Complaint. *See, e.g.*, SAC ¶ 92 and FAC ¶ 97 (both discussing allegation that CW4 explained that the OTS voiced concerns that an OTTI then existed in the MBS portfolio in the second quarter of 2008). As such, this summary does not change the Court's analysis regarding scienter.

Overall, viewing the Second Amended Complaint's allegations as a whole, including the allegations regarding motive and the magnitude of the alleged accounting violations, as well as all other allegations in the Second Amended Complaint, Plaintiffs have not alleged the required strong inference of scienter under the PSLRA as to each or any of the Individual Defendants. In the Court's view, the allegations of the Second Amended Complaint do not give rise to an inference of the Individual Defendants' scienter that is more than merely plausible or reasonable or that is at least as compelling as any opposing inference of nonfraudulent intent. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Even with the additional allegations, the more compelling inference is that none of the Individual Defendants knew of the alleged fraud or were merely negligent.

## IV.

## CONCLUSION

As discussed above, the Second Amended Complaint does not cure the deficiencies of the

14

Amended Class Action Complaint regarding the Individual Defendants' scienter, as set forth in the Court's March 28, 2013 Memorandum Opinion and Order. Given its failure to properly allege scienter, the Second Amended Complaint's control person claims are also insufficient. As such, the Second Amended Class Complaint is hereby **DISMISSED**.

Normally the Court will allow a plaintiff the opportunity to amend where it appears that more careful or detailed drafting might overcome the deficiencies on which dismissal is based. *See McClellon v. Lone Star Gas Co.*, 66 F.3d 98, 103 (5th Cir. 1995); *see also Hitt v. City of Pasadena*, 561 F.2d 606, 608-09 (5th Cir. 1977) (observing that a complaint should only be dismissed under Rule 12(b)(6) "after affording every opportunity for the plaintiff to state a claim upon which relief can be granted"); *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000) (while court may dismiss a claim for failing to comply with Rule 9(b), "it should not do so without granting leave to amend, unless the defect is simply incurable or the plaintiff has failed to plead particularity after being afforded repeated opportunities to do so").

In this case, Plaintiffs have had multiple opportunities to state a claim, including their Second Amended Complaint, filed after the Court's March 28, 2013 decision detailing the deficiencies in the Amended Complaint. Under these circumstances, the Court determines that allowing further amendment will be futile and cause needless delay. Accordingly, in its discretion, the Court determines that further amendment of the pleadings is not warranted. As such Plaintiffs' claims against the Individual Defendants are hereby **DISMISSED WITH PREJUDICE**.[15] The Court will

---

[15] As stated above, given that Plaintiffs did not seek to replead against Defendant Temple-Inland in accordance with the Court's instructions, their claims against Temple-Inland are **DISMISSED WITH PREJUDICE**.

issue a separate Final Judgment after issuance of this order.

SO ORDERED.

SIGNED: July 30, 2013.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE