# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

————————

No. 13-10928

————————

BRUCE OWENS,

　　　　　Plaintiff - Appellant

v.

KENNETH M. JASTROW, II; KENNETH R. DUBUQUE; RONALD D.
MURFF; CRAIG E. GIFFORD,

　　　　　Defendants - Appellees

United States Court of Appeals
Fifth Circuit

**FILED**

June 12, 2015

Lyle W. Cayce
Clerk

————————————

Appeal from the United States District Court
for the Northern District of Texas

————————————

Before JOLLY, OWEN, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

This case arises out of one of the largest bank failures in United States history. In August 2009, in the wake of the financial and housing crises, Guaranty Bank's parent company filed for bankruptcy. Plaintiffs represent a putative class of former Guaranty stockholders whose equity interests were wiped out when Guaranty failed. They bring federal securities law claims against four former Guaranty executives, alleging that the executives made materially false and misleading statements regarding Guaranty's assets. The district court dismissed the claims. For the following reasons, we AFFIRM.

No. 13-10928

## FACTS AND PROCEEDINGS

Temple-Inland, Inc. ("Temple") was a holding company that operated a packaging and manufacturing business and a financial services business, Guaranty Financial Group Inc., ("GFG") which, in turn, owned Guaranty Bank (the "Bank").[1]  On November 29, 2007, Temple announced that its board of directors had approved a spin-off transaction that would leave GFG as independent owner of the Bank.  According to plaintiffs, Temple decided to spin off Guaranty because it was concerned about Guaranty's solvency, and about various cross-default covenants that would jeopardize Temple's own solvency if Guaranty became insolvent.  Plaintiffs allege that Temple did not provide Guaranty sufficient capital at the time of the spin-off.

Temple's concerns over Guaranty's solvency stemmed from the composition of Guaranty's asset portfolio.  Guaranty had purchased investments in residential mortgage-backed securities ("MBS"), which are created by pooling mortgage loans into a trust.  Guaranty's portfolio contained a significant amount of "non-agency" MBS—those issued by private institutions rather than government-sponsored entities.  Non-agency MBS are generally understood to have higher returns and higher risks than their government-sponsored counterparts.  Plaintiffs allege that Guaranty's non-agency MBS portfolio always constituted at least 22% of Guaranty's total assets.  Further, plaintiffs allege that a substantial portion of Guaranty's MBS was collateralized by risky adjustable rate mortgages.  On the other hand, none of Guaranty's MBS contained subprime mortgages.  Guaranty also did not invest in the most junior tranches, or levels, of MBS, meaning that losses would not affect Guaranty's investments until investors in junior tranches lost their

---

[1] This opinion uses the general term "Guaranty" when no distinction between GFG and the Bank is warranted.

No. 13-10928

entire investment.   Further, until June 2008, when certain MBS were downgraded or placed on negative watch, all of Guaranty's MBS were rated the highest level—AAA—by the major credit rating agencies.

Defendants Kenneth M. Jastrow, Kenneth R. Dubuque, Ronald D. Murff, and Craig E. Gifford were all high-level executives in Guaranty and, in some cases, Temple.   Plaintiffs claim that after the spin-off, Guaranty, led by defendants, violated Generally Accepted Accounting Principles ("GAAP") by systematically overvaluing its MBS portfolio and undervaluing its losses. Defendants allegedly compounded this problem by failing to properly record Guaranty's losses as "other than temporary impairment" ("OTTI"). Defendants reported these allegedly erroneous accounting figures in public filings.   Plaintiffs claim that defendants were motivated by the knowledge that, absent fraud, Guaranty's regulatory capital would have been inadequate and Guaranty would not have had time to procure capital necessary to continue as a going concern.

For a time, Guaranty was successful in masking its financial difficulties; it attracted capital infusions in 2008.   But Guaranty's health continued to decline.   In July 2009, Guaranty announced that, at the direction of the Office of Thrift Supervision ("OTS"), Guaranty had amended its Thrift Financial Report for the period ending March 31, 2009 and recorded a $1.62 billion impairment on its MBS portfolio.   Soon after, the OTS closed Guaranty and the Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver.   GFG filed for bankruptcy protection on August 27, 2009.

On August 22, 2011, Guaranty's bankruptcy trustee, Kenneth L. Tepper, sued Temple and various other defendants, including Jastrow and Dubuque,

No. 13-10928

alleging that they had raided over $1 billion in assets from Guaranty.[2]  The *Tepper* complaint alleged that Temple and the other defendants "fraudulently strip[ped] [Guaranty] of assets beyond the point of solvency and adequate capitalization."  In November 2012, the *Tepper* action settled for $80 million.

Plaintiffs initially filed this putative class action on November 11, 2011. They filed an amended class action complaint on April 19, 2012 on behalf of all purchasers of GFG common stock between December 12, 2007 and August 24, 2009 (the "Class Period"), against Temple and the individual defendants. Temple and the individual defendants moved to dismiss the amended complaint.  The district court granted the motions on several grounds, including the failure to adequately allege defendants' scienter.  The district court granted plaintiffs leave to amend, however, and plaintiffs filed the Second Amended Complaint ("SAC"), which alleged claims against the individual defendants alone.  The individual defendants again moved to dismiss.  The district court found that the SAC did not adequately allege scienter, and granted the motions, dismissing the case with prejudice. Plaintiffs timely appealed.

## DISCUSSION

### I. Standard of Review

The SAC alleges violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  Plaintiffs also allege control person violations of Section 20(a) of the Exchange Act.  15 U.S.C. § 78t(a).  The elements of a private securities fraud claim based on Section 10(b) and Rule 10b-5 are "(1) a material misrepresentation (or omission), (2) scienter, i.e., a wrongful state of mind, (3)

---

[2] Complaint, *Tepper v. Temple-Inland, Inc.*, No. 3:11-cv-02088 (N.D. Tex. Aug. 22, 2011).

a connection with the purchase or sale of a security, (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation'; (5) economic loss; and (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 238–39 (5th Cir. 2009) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)). Defendants argue that the SAC fails to adequately allege the material misrepresentation, scienter, and loss causation elements.

We review a district court's dismissal of federal securities law claims under Rule 12(b)(6) de novo. *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 206 (5th Cir. 2009). We accept "all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiffs." *Moffett v. Bryant*, 751 F.3d 323, 325 (5th Cir. 2014) (internal quotation marks and citation omitted). "To survive a Rule 12(b)(6) motion, the plaintiff must plead enough facts to state a claim to relief that is plausible on its face." *Flaherty*, 565 F.3d at 206 (internal quotation marks and citation omitted).

Pursuant to Federal Rule of Civil Procedure 9(b), plaintiffs must state all allegations of fraud with particularity by identifying the "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (internal citation and alterations omitted). Securities fraud claims brought by private litigants are also subject to the pleading requirements imposed by the Private Securities Litigation Reform Act ("PSLRA"). "[T]he PSLRA requires a plaintiff to identify each allegedly misleading statement with particularity and explain why it is misleading." *Lormand*, 565 F.3d at 239 (citing 15 U.S.C. § 78u–(b)(1)). At a minimum, the PSLRA pleading standard incorporates the "who, what,

No. 13-10928

when, where, and how" requirements of Rule 9(b).  *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 349–50 (5th Cir. 2002).

Plaintiffs allege that defendants made an array of materially false and misleading statements in SEC filings and public comments throughout the Class Period.  Defendants allegedly violated GAAP and SEC rules by (1) reporting overstated MBS values, and understated losses, stemming from the use of flawed internal asset pricing models; and (2) failing to timely record OTTI in the portfolio.

## II. Scienter

The central issue in this case is whether the SAC contains sufficient facts to allege scienter as to each defendant.  The district court dismissed the SAC on the ground that it did not.

The PSLRA imposes heightened pleading standards on private plaintiffs bringing actions pursuant to Section 10(b) and Rule 10b-5.  *See* 15 U.S.C. § 78u–4; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007).  To demonstrate scienter, the PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  In this circuit, "[t]he required state of mind [for scienter] is an intent to deceive, manipulate, defraud or severe recklessness."  *Lormand*, 565 F.3d at 251 (internal quotation marks and citation omitted).  This appeal primarily focuses on whether the SAC states with particularity facts giving rise to a strong inference that each defendant was severely reckless.

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

No. 13-10928

*Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002) (internal quotation marks and citation omitted).

To withstand a 12(b)(6) motion to dismiss, the required "strong inference" of severe recklessness must be "more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. at 324. A reviewing court therefore must "take into account plausible inferences opposing as well as supporting a strong inference of scienter." *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) (citing *Tellabs*, 551 U.S. at 324). A complaint will survive only if the inference of scienter is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. "[A] tie favors the plaintiff." *Lormand*, 565 F.3d at 254 (citing *Tellabs*, 551 U.S. at 324).

## A. Threshold issues

Plaintiffs and defendants each raise one issue that they contend warrants reversal or affirmance, respectively, without requiring consideration of the specific scienter allegations.

### i. Holistic review

Plaintiffs contend that the district court's scienter analysis was flawed because the district court evaluated the scienter allegations individually rather than collectively. When analyzing a complaint for scienter, a court must "assess all the allegations holistically," not in isolation. *Tellabs*, 551 U.S. at 326; *see also Lormand*, 565 F.3d at 251 ("The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."). The district court methodically analyzed the allegations, determining whether each did or did not contribute to a strong inference of scienter. Then, for each defendant, the district court concluded that the

7

No. 13-10928

various allegations, taken together, did not raise a strong inference of scienter that was at least as compelling as the opposing inference that the defendant did not know of the fraud or was merely negligent.

Plaintiffs raise two points in support of their argument. First, plaintiffs contend that the district court's two-step method of first assessing the allegations individually, before weighing them collectively, violates *Tellabs*'s prescription. In support, they cite the Sixth Circuit's decision in *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011). *Frank* criticized the method the district court employed in this case:

> Our former method of reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees. Furthermore, after *Tellabs*, conducting an individual review of myriad allegations is an unnecessary inefficiency. Consequently, we will address the Plaintiffs' claims holistically.

*Id.* Contrary to plaintiffs' suggestion, *Frank* does not stand for the proposition that *Tellabs* forbids the method of first reviewing each allegation individually; rather, *Frank advises against* such a method because, in the view of that court, it is "an unnecessary inefficiency." *Id.* Moreover, this court, after *Tellabs*, has endorsed the district court's two-step method. *See Central Laborers' Pension Fund v. Inegrated Elec. Servs. Inc.*, 497 F.3d 546, 552–55 (5th Cir. 2007) (employing two-step method); *see also In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 703 (9th Cir. 2012) ("[A] dual analysis remains permissible so long as it does not unduly focus on the weakness of individual allegations to the exclusion of the whole picture."). A district court may best make sense of scienter allegations by first looking to the contribution of each individual allegation to a strong inference of scienter, especially in a complicated case such as this one. Of course, the court must follow this initial step with a holistic look at all the scienter allegations.

No. 13-10928

Second, plaintiffs argue that, even if the two-step method is permissible, the district court did not, as it said, view "the [SAC's] allegations as a whole." Plaintiffs point to numerous instances where the district court stated that a particular allegation did not "alone" contribute to a strong inference of scienter. The district court did not err in stating, throughout its inquiry, that various allegations, standing alone, did not constitute a strong inference of scienter. As a matter of efficiency, if any single allegation, standing alone, created a strong inference of scienter, the court would not need to consider additional allegations of scienter. After analyzing each allegation alone, the district court properly proceeded to the second step and determined that the allegations, as a whole, did not raise a strong inference of scienter as to each defendant. *See Shaw*, 537 F.3d at 534–41 (concluding, after analysis of individual allegations, that together, they did not raise a strong inference that defendant was severely reckless); *Central Laborers*, 497 F.3d at 555 (concluding, without detailed analysis, that the plaintiff's "allegations read *in toto* do not permit a strong inference of scienter"). In any event, our de novo review will assess holistically the SAC's scienter allegations.

### ii. Group pleading

Defendants complain that the SAC contains impermissible group pleading. This court has rejected the group pleading doctrine. *See Southland*, 365 F.3d at 365 ("[T]he PSLRA requires the plaintiffs to distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud.") (internal quotation marks omitted). Accordingly, "we do not construe allegations contained in the [SAC] against the 'defendants' as a group as properly imputable to any particular defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded." *Id.* Defendants contend that the SAC violates these rules by repeatedly using general terms like "Individual Defendants" and

9

No. 13-10928

"Bank executives." We agree that some allegations are not tied to a particular defendant. *See Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006).

Defendants disagree among themselves about the proper remedy for this deficiency in the SAC. Defendants Jastrow and Dubuque contend that group pleading and the related problem of puzzle pleading—where a court must wade through a complaint and pick out properly pleaded segments—warrants dismissal of the entire SAC. Defendants Murff and Gifford propose disregarding group-pleaded allegations and considering only those that identify each defendant. It is appropriate to disregard the group-pleaded allegations and determine whether the remaining, properly pleaded allegations raise a strong inference of scienter. *See id.* at 288 ("The district court correctly dismissed the claims relying on group pleading."); *Southland*, 365 F.3d at 365 (disregarding the allegations against "defendants" as a group). Although we do not commend plaintiffs' inclusion of group-pleaded allegations interspersed with defendant-specific allegations, in this case we are able to "separat[e] the wheat from the chaff," and outright dismissal is unwarranted. *See In re Enron Corp. Secs, Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 611 (S.D. Tex. 2003). This is not a situation where "[n]o attempt is made to isolate statements and particularize their falsity." *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 180 (5th Cir. 1997).[3] Accordingly, we disregard the group-pleaded allegations and discern whether the remaining allegations state a claim for relief as to each defendant.

---

[3] We are also wary that a strict rule requiring outright dismissal for any group or puzzle pleading could cause future plaintiffs to omit from complaints helpful information about the activities of a non-party or contextual statements about defendants that may not be able to be particularized.

No. 13-10928

## B. Allegations common to more than one defendant

We now discuss the allegations that, according to plaintiffs, lead to a strong inference of scienter. First, we look at the various allegations that apply to more than one defendant and discuss the appropriate inference, if any, to be drawn from them.[4] Then we proceed, defendant by defendant, adding any allegations unique to that defendant, to comprehensively determine if plaintiffs have alleged facts that give rise to a strong inference of scienter as to any defendant. The SAC contains no direct allegations of fraudulent conduct; rather, plaintiffs rely on circumstantial allegations. *See Shaw*, 537 F.3d at 535.

### i. Knowledge of undercapitalization and motive

One of plaintiffs' primary allegations is that defendants had knowledge of Guaranty's undercapitalization[5] and, as officers and directors, wanted to raise capital necessary for the continued operation of the business. This, plaintiffs say, created a motive for defendants to overstate the value of Guaranty's MBS portfolio; if Guaranty appeared to be a healthy company, it could more easily attract much-needed capital.

The SAC pleads with particularity that defendants Jastrow, Dubuque, and Murff—but not Gifford—knew of Guaranty's undercapitalization. The SAC alleges that Dubuque met with Temple's management before the spin-off and suggested that Guaranty needed $200 million in additional capital.

---

[4] These allegations do not constitute group pleading because they are sufficiently particularized. However, because they apply to more than one defendant, they are most easily discussed together.

[5] The SAC's use of the term "undercapitalized" likely refers to the industry-specific definition of regulatory capital, *see* 12 C.F.R. § 325.103 (defining the risk-based capital ratios that constitute a bank's undercapitalization), and not the colloquial definition, *see Black's Law Dictionary* 251 (10th ed. 2014) (defining "undercapitalization" as "[t]he financial condition of a firm that does not have enough capital to carry on its business"). Regardless, this distinction is not significant for our discussion of scienter.

No. 13-10928

Dubuque is also alleged to have had discussions after the spin-off in which he expressed the desire for $100 million in additional capital. Dubuque and Murff are alleged to have led a meeting in the spring of 2008 concerning Guaranty's capital position. The SAC also derives knowledge of undercapitalization—and motive—from the *Tepper* complaint.[6] The *Tepper* complaint alleged that Jastrow, Dubuque, and Murff knew of Guaranty's undercapitalization before the spin-off. These allegations adequately state that Jastrow, Dubuque, and Murff were aware of Guaranty's need for capital during the Class Period.[7]

The resulting question is whether any inference of scienter should be drawn from defendants' knowledge of Guaranty's undercapitalization. The desire to raise capital in the normal course of business does not support a strong inference of scienter because virtually all corporate insiders share this goal. *See Abrams*, 292 F.3d at 434 (holding that a desire to raise capital, receive incentive compensation, and sell stock at inflated prices did not support a strong inference of scienter). Plaintiffs contend that the inference of scienter here is much greater because capital infusions were not merely desirable, but necessary for the ongoing operation of Guaranty.

"[A]ppropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter, but . . . allegations of motive and opportunity, without more, will *not* fulfill the pleading requirements of the PSLRA." *Goldstein v. MCI WorldCom*, 340 F.3d 238, 246 (5th Cir. 2003). In

---

[6] The parties do not dispute that we should consider the *Tepper* complaint's allegations regarding knowledge of undercapitalization because they were expressly incorporated by the SAC. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015) (considering, in deciding a motion to dismiss, the complaint as well as "any statements or documents incorporated in [the complaint] by reference").

[7] Plaintiffs argue that the SAC alleges Gifford's knowledge of undercapitalization because, due to his position as Guaranty's Principal Accounting Officer, he "cannot credibly claim ignorance of [Guaranty's] financial situation." This allegation is not contained within the SAC and, in any event, is not pled with particularity. We therefore decline to infer that Gifford had knowledge of Guaranty's undercapitalization.

No. 13-10928

*Goldstein*, WorldCom's CEO was alleged to have avoided taking an accounting charge for delinquent receivables in order to artificially inflate results and ensure a merger was completed. *See id.* at 249–250. Plaintiffs alleged that the CEO's motive contributed greatly to scienter, not only because the CEO would lose millions in compensation if the stock price dropped, but also because such a drop would accelerate payment on his personal loans. *See id.* at 250. We found that the merger was important and more than routine, and supported a "strong and unique incentive" for the CEO to commit fraud. *Id.* Yet even this strong motive evidence was insufficient, on its own, to raise a strong inference of scienter, and, after considering other allegations of scienter, we affirmed the district court's dismissal of the complaint. *See id.* at 251–54.

Plaintiffs maintain that this case is similar to *Nathenson v. Zonagen Inc.*, 267 F.3d 400 (5th Cir. 2001). This court, in *Nathenson*, held that plaintiffs "barely" pled a strong inference of scienter as to a defendant who was President, CEO, and a director of a "one product company" and was alleged to have made misstatements regarding a patent's applicability to that single product. *See id.* at 424–25. *Nathenson* suggested, in dicta, that the rare case might establish a strong inference of scienter solely from motive and opportunity allegations. *See id.* at 412 ("[I]t would seem to be a rare set of circumstances indeed where [motive and opportunity] allegations alone are both sufficiently persuasive to give rise to a scienter inference of the necessary strength and yet at the same time there is no basis for further allegations also supportive of that inference."). This is not such a case, even if one could exist after *Goldstein*'s pronouncement seemingly foreclosing the possibility. Defendants' alleged misstatement of the MBS portfolio valuation was not as crucial to the continuing operation of Guaranty as were the misstatements regarding the patent's applicability in *Nathenson*. Although Guaranty's non-agency MBS portfolio was undeniably a large and important business asset, it

13

No. 13-10928

is not alleged to have been Guaranty's single product, instead comprising at all relevant times no more than 22% of Guaranty's total assets. *See Abrams*, 292 F.3d at 438 (Parker, J., concurring) (concluding that defendants' recklessness could not be inferred when the source of accounting irregularities accounted for 20% of the company's revenues).

The motive allegations contribute to a finding of scienter as to Jastrow, Dubuque, and Murff, but must be considered together with other allegations to determine if they rise to a strong inference of scienter.[8]  *See Nathenson*, 267 F.3d at 412 ("Appropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter.").

### ii. Knowledge of red flags regarding MBS valuation

Plaintiffs allege that Guaranty's MBS valuation and its decision not to recognize losses as "other than temporary" violated GAAP.  Because the question of whether the statements actually violated GAAP is fact-dependent, it is not properly addressed on a motion to dismiss.  *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257 (5th Cir. 2005).  The issue, for the scienter analysis, is whether, assuming the statements violated GAAP, the allegations give rise to a strong inference that individual defendants were severely reckless in valuing the securities.

Plaintiffs contend that several "red flags" included in the SAC should have alerted each defendant that the MBS valuation was materially incorrect. The red flags include (1) a 250% increase in the average delinquency rate on Guaranty's non-agency MBS portfolio in the nine-month period ending June

---

[8] We decline to draw additional inferences of scienter from the *Tepper* action.  Because the *Tepper* complaint covers only events before the Class Period, it does not directly address the misstatements at the heart of this case.  For this reason, and because the persuasive force of the *Tepper* action's settlement is disputed, we limit the contribution to scienter of the *Tepper* complaint to Jastrow's, Dubuque's, and Murff's knowledge of Guaranty's undercapitalization.

No. 13-10928

30, 2008; (2) a decrease in the value of the non-agency MBS portfolio to 60% of its cost by June 30, 2008; and (3) the downgrading or placing on negative watch of ten securities in Guaranty's portfolio in June and July 2008.

The "red flags" add little inference of scienter. Each "red flag" is alleged to have become knowable only in June 2008, whereas many of the alleged misrepresentations occurred before June 2008. Even as to those alleged misstatements that occurred after the "red flags" were apparent, the red flags were disclosed to the public, which negates the inference that defendants acted with scienter. *See Fire & Police Pension Ass'n of Colo. v. Simon*, 778 F.3d 228, 244 (1st Cir. 2015) (holding that a company's disclosures of red flags "undercut any inference of scienter"); *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1211 (11th Cir. 2001) (noting that various disclosures of red flags "undermine[d] any hint of fraud"). Plaintiffs dispute whether and to what extent the red flags were disclosed. However, documents referenced in the SAC and attached to defendants' motion to dismiss confirm that the alleged red flags, or at least the inputs that would allow the public to easily calculate them, were disclosed promptly by Guaranty. *See Tellabs*, 551 U.S. at 322 (holding that, on a Rule 12(b)(6) motion, a court must consider "documents incorporated into the complaint by reference").

Additional transparency, not disputed by plaintiffs, further negates the inference of scienter. Defendants disclosed that Guaranty's MBS valuation was based on internal models, not market prices, and Guaranty disclosed the inputs it used in its models. Guaranty provided investors with additional explanatory and cautionary information from which they could judge the accuracy of the models and Guaranty's decision not to recognize losses as other than temporary. Guaranty's filings further disclosed that valuation was "difficult," and that the valuation estimates involved a "high degree of uncertainty" and might "prove to be materially incorrect." As the Supreme

15

No. 13-10928

Court recently recognized, "an investor reads each statement within [an SEC document], whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1330 (2015).

We distinguish this case from *Spitzberg v. Houston American Energy Corporation*, 758 F.3d 676 (5th Cir. 2014). In *Spitzberg*, an energy company made public statements estimating billions of barrels of oil reserves even though the company had done no geological testing. *Id.* at 680, 684. We held that defendants were severely reckless because using the term "reserves"—an industry-specific term indicating that production or testing had occurred— would present an obvious danger of misleading investors as to the value of the company's assets. *Id.* at 681, 684. Here, in contrast, defendants' disclosures conveyed to investors that its MBS valuations were far from certain.

Defendants' disclosure of the "red flags" and candidness about the uncertainty underlying its models neutralize any scienter inference from "red flags."

### iii. Magnitude of alleged misstatements

Plaintiffs contend that the magnitude of the valuation errors contributes to a strong inference of scienter. The significance of a large accounting error depends on the circumstances. In *Goldstein*, we held that a $685 million write-off did not create a strong inference of scienter because the company was large and frequently took similarly-sized write-offs. 340 F.3d at 251. Here, the magnitude was undoubtedly large; the OTS directed Guaranty to restate its March 31, 2009 Thrift Financial Report and recognize a $1.62 billion OTTI, representing an overvaluation of the MBS portfolio of 100%. But, as we discuss in Section II.C.i, *infra*, the magnitude's contribution to an inference of scienter

No. 13-10928

is small, because the valuation involved subjective accounting concepts that can yield a wide range of reasonable results.  *See Shaw*, 537 F.3d at 536.[9]

## C. Individual defendants

Having discussed the underpinnings and merits of the common allegations regarding scienter, we proceed to a holistic review, for each defendant, of all scienter allegations applicable to that defendant.

### i. Dubuque and Murff[10]

Dubuque was President, CEO, and a director of Guaranty until his resignation on November 19, 2008.  He was also Guaranty's Chairman from August 26, 2008 until his resignation.  Murff was Senior Executive Vice President and Chief Financial Officer of Guaranty until his resignation on July 10, 2009.  From October 27, 2008 until his resignation, Murff was also Guaranty's Principal Accounting Officer.  Plaintiffs seek to hold Dubuque and Murff liable for their conduct throughout the Class Period, including statements made in Guaranty's 2007 10-K, 2008 10-Qs, and several other statements made between February 2008 and November 2008.

As discussed, *supra*, the SAC alleges that Dubuque and Murff knew of Guaranty's undercapitalization and had a motive to falsify the MBS valuation to raise additional capital.  However, because knowledge and motive alone are insufficient to raise a "strong inference" of scienter, *Goldstein*, 340 F.3d at 246,

---

[9] Before the district court, plaintiffs argued that the timing of each defendant's resignation suggested scienter.  The district court concluded that Guaranty's overall decline, rather than securities fraud, was likely the impetus for the resignations.  The district court also concluded that defendants' signatures on Sarbanes-Oxley certifications did not lead to scienter absent the signer's knowledge of the underlying falsity or severe recklessness in recognizing it.  *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006).  On appeal, plaintiffs do not brief or argue either of these issues, so we do not include these factors in our analysis.  *See United States v. Whitfield*, 590 F.3d 325, 346 (5th Cir. 2009) ("[A] party waives any argument that it fails to brief on appeal.") (citing Fed. R. App. P. 28(a)(9)(A)).

[10] We discuss Dubuque and Murff together because the allegations involving each largely overlap.

No. 13-10928

we consider whether additional scienter allegations raise the required inference.

In addition to the knowledge allegations, the SAC alleges that Dubuque and Murff were aware of internal warnings regarding the MBS valuation. These allegations revolve around a confidential witness, designated in the SAC as CW1, who was responsible for purchasing MBS as Guaranty's Senior Vice President of Investments and Secretary of the Asset Liability Committee ("ALCO").[11]  The SAC alleges that, in January 2007, CW1 sent an email to Dubuque and Murff identifying several deficiencies in Guaranty's internal MBS pricing model, including (1) Guaranty's use of outdated parameters to value MBS and assess MBS losses; (2) its failure to independently verify the cash flows used in valuing MBS; (3) the elimination of liquidity factors from its valuation; (4) inadequate accounting of interest rate changes on adjustable rate mortgages; and (5) inadequate modeling of credit risk.[12]  The SAC further alleges that CW1 repeated his or her concerns about the model's deficiencies at ALCO meetings attended by Dubuque and Murff.  The SAC also alleges that CW5, the Chief Lending Officer and Chief Administrative Officer of Guaranty, attended ALCO meetings along with Dubuque and Murff, in which potential MBS write-downs were discussed.[13]  The SAC alleges that Dubuque and Murff knew or recklessly ignored that the models were flawed, and continued to use

---

[11] In cases under the PSLRA, plaintiffs may rely on confidential witnesses "provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Tchuruk*, 291 F.3d 336, 352 (5th Cir. 2002).  Here, plaintiffs describe the confidential witnesses' job positions with sufficient particularity.

[12] The district court discounted CW1's email because it occurred before the Class Period.  Knowledge gained before the Class Period may be retained months later and there is no indication that Guaranty drastically changed its valuation model after CW1's email.  Thus, the email is relevant to scienter.

[13] The SAC does not plead with particularity the dates of the ALCO meetings or the substance of the conversations, alleging only that they began in the fourth quarter of 2007 and continued into 2008.  Therefore, we do not draw any inferences from this allegation.

No. 13-10928

the models and report the resulting GAAP-noncompliant figures throughout the Class Period.

Dubuque's and Murff's continued reliance on Guaranty's internal valuation model and unchanged OTTI determinations, after CW1's warnings, does not lead to a strong inference of scienter.   That the reported figures are alleged to have violated GAAP is not, by itself, actionable. *See Shaw*, 537 F.3d at 534 ("[A] failure to follow GAAP, without more, does not establish scienter."); *Blackwell*, 440 F.3d at 290 ("[F]ailure to follow accounting standards, without more, does not establish scienter.").  Plaintiffs must also plead facts leading to a strong inference that each defendant knew the numbers violated GAAP or was severely reckless in disregarding the concerns. *See Abrams*, 292 F.3d at 432.[14]

An inference of severe recklessness is more likely when a statement violates an objective rule than when GAAP permits a range of acceptable outcomes. *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 638 (E.D. Va. 2000) ("[I]f the GAAP rules . . . Defendants are alleged to have violated are relatively simple, it is more likely that the Defendants were aware of the violations and consciously or intentionally implemented or supported them, or were reckless in this regard.").   Applying GAAP often involves subjective determinations. *See Fine v. Am. Solar King Corp.*, 919 F.2d 290, 297 (5th Cir. 1990) ("GAAP tolerates a wide range of acceptable

---

[14] Defendants propose a more difficult standard for pleading scienter related to accounting estimates.  They suggest that plaintiffs must plead the opinions were both (1) false and (2) not honestly believed by the defendant when made, a standard adopted by the Second and Ninth Circuits. *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2nd Cir. 2011); *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1162 (9th Cir. 2009).  Requiring a plaintiff to allege that a defendant did not honestly believe a statement when made is inconsistent with the standard in this circuit, which permits scienter to be shown either by knowledge a defendant is publishing materially false information or by severe recklessness in publishing such information. *See Abrams*, 292 F.3d at 432.

No. 13-10928

procedures . . . ."); *Thor Power Tool Co. v. C. I. R.*, 439 U.S. 522, 544 (1979) ("Accountants long have recognized that generally accepted accounting principles are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. Generally accepted accounting principles, rather, tolerate a range of reasonable treatments, leaving the choice among alternatives to management.") (internal quotation marks omitted).

While recognizing that some GAAP concepts may allow for subjective judgments, plaintiffs argue that defendants' MBS valuation and decision not to recognize an OTTI were governed by objective standards. Specifically, plaintiffs argue that defendants violated an objective GAAP directive requiring that OTTI be assessed "at the individual security level" by failing to "drill down" and assess OTTI at the individual *loan* level. Plaintiffs misapprehend this GAAP requirement. In determining whether to recognize an OTTI, GAAP does not require a company to assess the likelihood of repayment of each of thousands of loans in each security.[15] Because plaintiffs do not allege that defendants failed to value each *security*, they have not plausibly alleged a violation of an objective GAAP component.

Even at this early stage of the proceedings—where it is improper to engage in detailed discussion of GAAP rules—it is undeniable that there is some subjectivity present in Guaranty's decision to continue using its internal models and to delay recognizing impairments as other than temporary. *See* FASB Staff Position No. EITF 99-20-1, at 1 (permitting "the use of reasonable management judgment of the probability that the holder will be unable to collect all amounts due"); *id.* at 4 (listing multiple factors that influence an OTTI determination); *id.* at 6 ("[J]udgment is required in determining whether

---

[15] It is doubtful that Guaranty, as an investor in MBS, was even provided ongoing updates on the performance of each loan within the securities such that it could have engaged in a loan-by-loan valuation.

No. 13-10928

factors exist that indicate that an impairment loss has been incurred at the end of the reporting period.  These judgments are based on subjective as well as objective factors.").[16]  Therefore, plaintiffs must show that Dubuque's and Murff's decision to disregard CW1's warnings and to continue to use the internal model and OTTI recognition procedures was unreasonable even in light of the subjective nature of the GAAP requirements.  *See Fine*, 919 F.2d at 297.

Although plaintiffs argue that Dubuque and Murff were "repeatedly" made aware of the deficiencies in Guaranty's models, the email from CW1 is the only warning alleged to have been conveyed to Dubuque and Murff.  CW1's warnings did not mention GAAP and do not seem to suggest that any issues were so severe that they could lead to a large overvaluation of the MBS portfolio.

Dubuque and Murff relied on outside ratings agencies, which rated all of Guaranty's MBS AAA until June 2008.  We find that reliance on AAA ratings, when CW1 did not caution that reliance on major outside ratings agencies was unwarranted, was not severely reckless.  FASB guidance explicitly instructs companies to consider a security's credit rating when deciding whether to recognize a loss as other than temporary.  Moreover, defendants were not alone in relying on AAA ratings in the face of potential red flags.  OTS, Guaranty's regulator, similarly failed to recognize risks associated with Guaranty's MBS portfolio "primarily because the nonagency MBSs that Guaranty bought were graded AAA by credit rating agencies."  OTS's report on Guaranty's demise found that: "From 2004 through 2007, both [Guaranty] and OTS relied on the AAA ratings and considered the risk of purchasing AAA-rated nonagency

---

[16] We may consider these documents in our review because the SAC refers to them and they are in the record.  *See Tellabs*, 551 U.S. at 322.

MBSs to be minimal." At the time of CW1's warnings in 2007, both Guaranty and its federal regulator viewed the AAA ratings to be a crucial factor in the MBS portfolio's valuation.

We find persuasive the Second Circuit's discussion of very similar allegations in *City of Pontiac Policemen's and Firemen's Retirement System v. UBS AG*, 752 F.3d 173, 187 (2d Cir. 2014). There, plaintiffs alleged that UBS's investment bank "disregarded . . . observable market inputs and red flags demonstrating that [its] mortgage-related asset portfolio was materially impaired" when it declined to write down its assets. *Id.* The Second Circuit held that UBS was not reckless in relying on the assets' AAA rating in the face of internal and external uncertainty and disagreement about the valuation of mortgage-related assets. *See id.* The court concluded:

> While the collapse in the entire subprime market revealed UBS's failure to recognize the vulnerability of *all* its mortgage-related assets to have been poor judgment, poor business judgment—even if attributable to monetary incentives—does not establish an inference of recklessness that is cogent and compelling [and] thus strong in light of other explanations. We do not recognize allegations of fraud by hindsight.

*Id.* at 187–88 (internal quotation marks and citations omitted). Here, plaintiffs' allegations similarly combine poor business judgment with financial motive. *See Abrams*, 292 F.3d at 433 (noting that failure to follow GAAP "can easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action").[17]

Considered holistically, plaintiffs' allegations of knowledge of Guaranty's undercapitalization, a large misstatement, red flags, and ignorance of internal warnings, do not raise a strong inference of severe recklessness that is equally

---

[17] We do not foreclose the possibility of finding a strong inference of scienter based on a GAAP violation in future cases should the totality of the allegations warrant such a finding.

No. 13-10928

as likely as the competing inference that Dubuque and Murff negligently relied on the AAA ratings and believed that Guaranty's internal models were accurate. Plaintiffs come closest to alleging scienter by noting that Dubuque and Murff continued to use the internal models even after the ratings agencies downgraded or placed some of Guaranty's MBS on negative watch. But the SAC contains no particularized allegations of renewed warnings to Dubuque and Murff in the 18 months between CW1's January 2007 email and the earliest downgrades in June 2008. It is also undisputed that Guaranty never purchased the most junior tranche of MBS, meaning that there was a buffer before losses would begin to affect its portfolio. *See Blackwell*, 440 F.3d at 289 (finding no scienter, in part because outside investors absorbed the first 5 to 10% of losses).[18] We find that plaintiffs have not sufficiently alleged scienter as to Dubuque or Murff.

## ii. Jastrow

Jastrow was the CEO and Chairman of the Board of Directors of Temple until the spin-off, and was Chairman of the Board of Directors of Guaranty until his resignation on August 26, 2008. Plaintiffs seek to hold Jastrow liable for wrongful conduct from the beginning of the Class Period through his resignation. Plaintiffs identify two alleged misstatements made by Jastrow. First, Jastrow signed a cover letter to a Form 8-K filed with the SEC in December 2007, just prior to the spin-off. The Form 8-K contained a statement

---

[18] Dubuque, alone among defendants, presents a potential mitigating factor against inferring scienter. In August 2008, he purchased over $700,000 worth of Guaranty shares. According to Dubuque, the purchase of Guaranty stock during the Class Period "suggest[s] the absence of any nefarious motives." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010). We place little value on Dubuque's stock purchases. While the record reflects Dubuque's purchases of stock, it is devoid of facts showing whether Dubuque kept his holdings through the price drop—which would be some evidence of lack of scienter—or sold them at an inflated price before any corrective disclosure—which would not be inconsistent with fraudulent intent.

23

No. 13-10928

that financial disclosures were based on GAAP. Second, Jastrow signed a Form 10-K issued by Guaranty on February 29, 2008. Plaintiffs contend that the 10-K's statement that its financial statements conformed with GAAP was materially false.

The SAC did not allege that Jastrow was ever informed of internal disagreements or warnings regarding Guaranty's MBS valuation. Plaintiffs do not allege that he received any communications from any of the confidential witnesses. The "red flags" highlighted in the SAC are not alleged to have alerted anyone to problems in the MBS portfolio until June 2008, several months after Jastrow's last alleged misstatement. As discussed, *supra*, the SAC's invocation of the *Tepper* complaint alleges that Jastrow had knowledge of Guaranty's undercapitalization during the Class Period. This constitutes a possible motive and creates a slight inference of scienter, but does not rise to the required "strong inference."

The only additional allegation as to Jastrow does not provide the missing piece. The SAC alleges that, at a Temple board meeting, Jastrow stated that the California real estate markets were deteriorating because adjustable rate mortgages were being reset.[19] Plaintiffs contend that this observation contributes to an inference of scienter because the mortgages underlying Guaranty's MBS portfolio comprised a high concentration of California adjustable rate loans. Together, Jastrow's knowledge of Guaranty's undercapitalization and awareness of the decline of the California real estate market do not rise to the level of a "strong inference" of scienter that is at least as likely as the alternative inference that Jastrow was merely negligent in

---

[19] Plaintiffs do not plead with particularity when Jastrow made this comment, only alleging that it occurred "before the Spin-Off."

No. 13-10928

believing that any decline was temporary and would not affect Guaranty's AAA-rated securities.

### iii. Gifford

Gifford was Guaranty's Controller until December 2007 and was Guaranty's Executive Vice President and Principal Accounting Officer from December 2007 until his resignation on October 27, 2008. Plaintiffs seek to hold Gifford liable for wrongful conduct from the beginning of the Class Period through his resignation. Plaintiffs identify three alleged misstatements made by Gifford. Gifford signed Guaranty's 2007 10-K and two 10-Qs, filed on April 29, 2008 and August 11, 2008, all of which allegedly included the misrepresentation that the financial statements contained therein complied with GAAP.

The case for Gifford's scienter is the weakest of any defendant. Gifford was not a party to the *Tepper* action, nor are there any other allegations that he was aware of Guaranty's undercapitalization at any point during the Class Period. The SAC does not allege that Gifford was privy to any concerns about deficiencies in Guaranty's internal valuation models.

Essentially, the SAC alleges only that Gifford held the position of Principal Accounting Officer at the time a large misstatement was made, and that red flags existed. We have already discussed why the magnitude of the misstatement and red flags do not create a strong inference of scienter, and Gifford's position within Guaranty does not support a strong inference of scienter. "A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." *Abrams*, 292 F.3d at 432; *see also Goldstein*, 340 F.3d at 251 (concluding that the allegation that defendant was a "hands-on" CEO and therefore must have been aware of accounting error was not specific enough to

No. 13-10928

support an inference of scienter).  Viewed holistically, the allegations against Gifford do not create a strong inference of scienter.

### III. Other issues

Because of our conclusion that plaintiffs have not raised a strong inference of scienter as to any defendant that is "at least as compelling as any opposing inference of nonfraudulent intent," *Tellabs*, 551 U.S. at 314, we need not reach the issue of loss causation.  Nor do we decide if Jastrow, as an outside director, was a "maker" of the alleged misstatements, only noting that this court has held that allegations that a corporate *officer* made statements are sufficient to state a claim that the officer is a "maker" of the statements. *Blackwell*, 440 F.3d at 287; *see also Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2304–05 (2011) ("[A]ttribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by . . . the party to whom it is attributed.").  We also affirm the district court's dismissal of plaintiffs' control person claim under 15 U.S.C. § 78t because that claim "cannot proceed in the absence of a primary violation of the securities laws." *Spitzberg*, 758 F.3d at 680 n.1.

### CONCLUSION

Our holistic review of the Second Amended Complaint confirms that plaintiffs have failed to adequately plead facts that raise a strong inference of scienter.  Accordingly, we AFFIRM the district court's dismissal of this action.

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

July 07, 2015

Ms. Karen S. Mitchell
Northern District of Texas, Dallas
United States District Court
1100 Commerce Street
Earle Cabell Federal Building
Room 1452
Dallas, TX 75242

        No. 13-10928   North Port Frfgtr Pension v. Temple-Inland,
                        Inc., et al
        USDC No. 3:11-CV-3119

Dear Ms. Mitchell,

Enclosed is a copy of the judgment issued as the mandate and a copy of the court's opinion.

                        Sincerely,

                        LYLE W. CAYCE, Clerk

                        By: _____
                        Shawn D. Henderson, Deputy Clerk
                        504-310-7668

cc:
        Mr. David J. Beck
        Mr. Karl G. Dial
        Ms. Joanne Early
        Mr. Chad Flores
        Ms. Debbie E. Green
        Mr. Joe B. Harrison
        Mr. Eric Alan Isaacson
        Mr. Elton Joe Kendall
        Mr. Mark Tamerlane Millkey
        Ms. Casey Lee Moore
        Mr. Stacy R. Obenhaus
        Mr. Marcos Rosales
        Mr. Samuel Howard Rudman
        Mr. William G. Whitehill